Jamaien MONROE, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

No. 406, 2010.

Supreme Court of Delaware.

Submitted: Aug. 24, 2011.
Decided: Sept. 14, 2011.

Patrick J. Collins, Esquire (argued) and Jennifer–Kate Aaronson, Esquire, Aaronson, Collins & Jennings, LLC, Wilmington, Delaware, for appellant.

Paul R. Wallace, Esquire (argued) and Maria T. Knoll, Esquire, Department of Justice, Wilmington, Delaware, for appellee.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS and RIDGELY, Justices, constituting the Court en Banc.

HOLLAND, Justice:

A grand jury indicted Jamaien Monroe ("Monroe") on one count of Murder in the First Degree, one count of Attempted Murder in the First Degree, six counts of Possession of a Firearm During the Commission of a Felony, four counts of Reckless Endangering in the First Degree, two counts of Possession of a Deadly Weapon by a Person Prohibited, and three counts of Endangering the Welfare of a Child. This indictment consolidated two incidents. Counts 12–14 related to the January 26, 2006 attempted murder of Andre Ferrell ("Ferrell") and Counts 1–11 related to the April 2, 2007 murder of Ferrell.[1] The jury found Monroe guilty of the Murder in the First Degree and related charges and not guilty of the Attempted Murder and related charges. Monroe was sentenced to life imprisonment plus twelve years.

Monroe has raised three issues in this direct appeal. First, he contends that the trial court abused its discretion by denying Monroe's motion to sever the trial of the attempted murder case from the murder case. Second, Monroe submits that his right to a fair trial before an impartial jury was violated when the evidence presented at trial did not clearly and convincingly establish the State's proffered "other crime" evidence of motive, due to the unwillingness of a State witness to testify. Third, Monroe argues that his due process rights under the Fourteenth Amendment to the United States Constitution were violated, when the trial judge denied his

---

1. Originally, the January 26, 2006 incident was indicted under Case No. 0601021343 and the April 2, 2007 incident was indicted under Case No. 0704002316. Both incidents were consolidated under Case No. 0601021343A. The Superior Court severed the two person prohibited charges therefrom and they were segregated to Case No. 0601021343B.

motions to suppress two separate pretrial eyewitness identifications.

We have concluded that each of Monroe's arguments is without merit. Therefore, the judgments of the Superior Court must be affirmed.

### Facts

The facts are stated in chronological order. They begin with an uncharged attempted robbery of Ferrell by Monroe. They continue with the attempted murder of Ferrell by Monroe the next day. The facts end fifteen months later with the murder of Ferrell by Monroe.

On January 25, 2006, in the early evening, Ferrell, along with his friends, Jonathan Wisher ("Wisher"), Ronald Wright, and "Sal," went to the G & P Deli at 28th and Market Streets in the City of Wilmington. As Ferrell and Ronald Wright walked towards the deli, they passed by Monroe, Kason Wright and an unknown person. Ferrell and Ronald Wright went into the deli.

Ferrell left the deli before Ronald Wright. At trial, the State presented circumstantial evidence that Ferrell got into a struggle with Ronald Wright and Monroe during an attempt to steal Ferrell's necklaces. Ferrell was left bleeding from the back of his head and his necklace chain was broken. The unknown individual remained in the area and said he had no knowledge of an attempt to rob Ferrell. No criminal charges were filed.

On January 26, 2006, around 12:30 p.m., Ferrell, his uncle "Tony" Wisher, Ronald Wright, and "Sal" were driving in the City of Wilmington. After dropping off his uncle and picking up his brother, Aaron Mummert ("Mummert"), Ferrell drove to the area of 23rd and Carter Streets. As they turned left onto Carter Street, they saw a green Suburban parked partially on the sidewalk on the left side of the street. Some of the occupants of Ferrell's vehicle saw Monroe in the backseat of the Suburban holding a .38 caliber revolver.

At this time, someone named "Brownie" came out into the street, encouraging Ferrell to stop and talk. Ferrell stopped in front of and to the right of the Suburban. The State presented evidence at trial that while Ferrell and "Brownie" were talking, Monroe fired five or six shots towards Ferrell's vehicle. Upon hearing the shots, Ferrell sped off. Bullets hit his car and Ferrell was shot in the back.

Ferrell drove to his grandmother's house at 28th and Washington Streets. He was taken from there to the hospital. Bullet holes were found on the driver's side of Ferrell's car. Warrants were issued for Monroe's arrest for attempted murder, but efforts to apprehend him were unsuccessful.

Fifteen months later, on the evening of April 2, 2007, Ferrell, his girlfriend, Shameka Brown ("Brown"), and his son went to the Village of Crofton in Newark, Delaware to pick up Ferrell's and Brown's minor daughter. While driving, Brown noticed her co-worker, Ronise Saunders ("Saunders"), driving a later-model boxed-shaped white car. The two acknowledged each other and kept driving, Saunders towards Lexington Green Apartments where she lived, and Ferrell towards the Village of Crofton.

After picking up their child, Ferrell and Brown went to Derrs' Market ("Derrs"), located in the Taylortowne Shopping Center in Newark, Delaware, across the street from the Lexington Green Apartments. As Ferrell and Brown drove into Derrs' parking lot, they again saw the white car, this time driven by Saunders' boyfriend (Monroe), backing out of a parking space and exiting Derrs' parking lot. Ferrell parked his car in front of Derrs and went

inside. Brown remained in the passenger seat of the car with the two children in the backseat.

Ferrell was in Derrs for approximately five minutes and returned to his car. He stood outside the driver's side with the door open, speaking with Brown. As Ferrell was about to get into the car, Brown saw someone wearing a white t-shirt, blue jeans, and a partially red-colored baseball cap. That person was holding a gun in his right hand. He approached Ferrell from behind, shot him four or five times, and then ran toward the Lexington Green Apartments.

New Castle County Police Officer Jane Paolo ("Officer Paolo") was the first police officer to arrive at the scene. She arrived within a minute or two of getting the dispatch about a shooting. Officer Paolo attempted CPR and confirmed that Ferrell had no pulse. Officer Paolo took Brown and the children to her patrol vehicle. At this time, Brown told Officer Paolo that the shooter looked like her co-worker's (Saunders') boyfriend.

At the time of the shooting, several people were in the parking lot, including Katharine Meier ("Meier"), who was going to the liquor store to purchase lottery tickets. As Meier was exiting her car, she heard five loud bangs coming from the area of Derrs. She heard screaming and turned to see Ferrell lying next to his car in front of Derrs. From approximately twenty yards away, Meier noticed a medium-tall, husky, black man with a pudgy face, wearing a white t-shirt, blue jeans, and a red and white baseball cap, backing away and then walking quickly through the parking lot. She went into the liquor store to ask someone to call 911. When Meier came back outside, she saw that same person running across the street into the Avalon Building of the Lexington Green Apartments.

Around the time of the homicide, Kimberly Klosowski ("Klosowski") and Diamonyell Bateman ("Bateman") were sitting outside their Lexington Green apartment buildings. Klosowski was watching the children playing in the front of the Drury building of the Lexington Green Apartments. She saw a black man, wearing a white t-shirt, blue jeans, and a red cap, running from the Edison building, through the Avalon building and into the parking lot of Derrs. Within the next thirty seconds, Klosowski heard gunshots coming from the area of Derrs. As she gathered the children to go inside, Klosowski saw the same man running back towards the apartment complex and through the Avalon building. Bateman was sitting at the picnic tables in front of the Lasalle building when she heard gunshots and saw a black man with a white t-shirt and red baseball hat run from Derrs towards the laundromat.

Officer Paolo transported Brown to the New Castle County Police Department and left her with Detective Diane Smith ("Detective Smith"), the chief investigating officer. Officer Paolo told Detective Smith about Brown's statement that the shooter looked liked her co-worker's (Saunders') boyfriend. Brown's initial description of the shooter was that of a stocky black male, who was taller than Detective Smith (approximately 5'5"), with minimal facial hair and a caramel complexion, wearing a red, blue, and white hat, each panel of the hat with a different color. Brown selected Monroe as Ferrell's assailant out of a six-person photographic lineup. Two days later, Meier went to the New Castle County Police Department. After viewing a six-person lineup, Meier identified Monroe's photograph as most like the man that she saw walking in the parking lot and running in the area of the Lexington Green Apartments.

Videotape from the Derrs' store depicted a man who looked like Monroe, wearing a black and red jacket in the market, in the immediate area prior to Ferrell's arrival. During a search of Saunders' apartment, located in the Lexington Green Apartments in the Edison Building, the police found a jacket fitting the description of the one seen in the videotape.

Further investigation revealed that Saunders owned a 1987 white four-door Mercury Marquis. The white Mercury Marquis was found unoccupied in Chester, Pennsylvania on April 10, 2007. Despite police attempts to find Saunders after Ferrell's homicide, she was not located before the February 2009 trial date.

### Severance Properly Denied

█ In a consolidated indictment, Monroe was charged with the Attempted Murder of Ferrell on January 27, 2006 and Murder in the First Degree for killing Ferrell on April 2, 2007. On appeal Monroe argues that the denial of his motion to sever "resulted in substantial injustice." According to Monroe, the joint trial of the two shootings of Ferrell "permitted the jury to use evidence from the attempted murder case to infer a general criminal disposition of Mr. Monroe to do harm to Andre Ferrell."

██ This Court reviews the Superior Court's denial of a motion to sever charges under an abuse of discretion standard.[2] The denial of a motion to sever the trial of multiple offenses will not be disturbed on appeal unless a defendant demonstrates a "reasonable probability that substantial prejudice may have resulted from a joint trial."[3]

Superior Court Criminal Rule 8(a) allows multiple offenses to be charged in the same indictment provided that one of the following circumstances exists: the offenses are of the same or similar character; the offenses are based on the same act or transaction; the offenses are based on two or more connected acts or transactions; or the offenses are based on two or more acts or transactions constituting parts of a common scheme or plan.[4] Monroe does not contest the initial consolidation of the charges relating to both shootings in one indictment.

[4–6] Rule 8 "is designed to promote judicial economy and efficiency, provided that the realization of those objectives is consistent with the rights of the accused."[5] Therefore, when it appears that the defendant is unduly prejudiced by a joinder of offenses in an indictment, the Superior Court may sever the offenses and order separate trials even though the offenses were properly joined in the same indictment.[6] In making that determination, the trial court must balance the rights of the accused against the legitimate concern of judicial economy to be achieved by a joint trial.[7] Delaware courts have recognized at least three situations in which prejudice arises:

(1) an accumulation of evidence of the various crimes to establish guilt, when the separate consideration of the evidence would not lead the jury to so find;
(2) a consideration of the evidence of one

2. *Caldwell v. State*, 780 A.2d 1037, 1055 (Del. 2001).

3. *Wiest v. State*, 542 A.2d 1193, 1195 (Del. 1988).

4. Del.Super. Ct.Crim. R. 8(a).

5. *Mayer v. State*, 320 A.2d 713, 717 (Del. 1974).

6. Del.Super. Ct.Crim. R. 14; *State v. McKay*, 382 A.2d 260, 262–63 (Del.Super.Ct.1978).

7. *Mayer v. State*, 320 A.2d at 717.

of the crimes would lead the jury to infer a general criminal disposition of the defendant to commit the crimes charged; and (3) the confusion of the jury or embarrassment to the defendant resulting from the presentation of different offenses to the joined offenses.[8] Monroe focuses on the second of these concerns.

■ The defendant has the burden of demonstrating that there is a reasonable probability that a joint trial caused substantial prejudice [9] to his defense.[10] A crucial factor to be considered by the trial judge in ruling on a motion to sever is whether the evidence of one crime would be admissible in the trial of the other crime.[11] If such evidence were admissible at a separate trial, there would be no unfair prejudice in having a joint trial.

■ "It [is] well established that evidence of other crimes [is] not, in general, admissible to prove that the defendant committed the offense charged." [12] Despite this general prohibition on evidence of "other crimes, wrongs or acts," Delaware Rule of Evidence ("D.R.E.") 404(b) provides that:

> Evidence of other crimes, wrongs or acts . . . may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.

Such "evidence of prior misconduct is admissible when it has 'independent logical relevance' and when its probative value is not substantially outweighed by the danger of unfair prejudice." [13]

D.R.E. 404(b) permits the admission of evidence that the accused committed "other crimes" to show motive, intent, identity and consciousness of guilt. In this case, the trial judge concluded that evidence of the attempted murder would be admissible at a separate murder trial to show Monroe's motive and intent to kill Ferrell. The trial judge's ruling stated, in part:

> Moreover, the court believes that severance would ultimately be a drain on judicial economy. If this court were to grant severance, the Murder First Degree case would presumably be tried first, and Delaware Rule of Evidence 404(b) would very likely allow the introduction in the murder trial of the evidence of the attempted murder as part of motive and/or intent.

The State submits that the Superior Court properly ruled that evidence of Monroe's attempt to kill Ferrell would be admissible at a separate murder trial to prove his intent to cause Ferrell's death and as a motive to eliminate Ferrell as a witness to the attempted murder. Accordingly, the State argues, that evidence was not introduced to show that Monroe had a propensity to act violently. Instead, the State contends, evidence of the attempted murder was both relevant and admissible to establish that Monroe had the intent and a motive to kill Ferrell.

---

**8.** *State v. McKay,* 382 A.2d at 262; *Caldwell v. State,* 780 A.2d at 1055.

**9.** *Skinner v. State,* 575 A.2d 1108, 1118 (Del. 1990) (citing *Younger v. State,* 496 A.2d 546, 549–50 (Del.1985)).

**10.** *Caldwell v. State,* 780 A.2d at 1055 (citing *Wiest v. State,* 542 A.2d at 1195).

**11.** *Wiest v. State,* 542 A.2d at 1195 n. 3 (citing *Bates v. State,* 386 A.2d 1139, 1142 (Del. 1978)).

**12.** *Getz v. State,* 538 A.2d 726, 730 (Del.1988) (citing *Bantum v. State,* 85 A.2d 741, 745 (1952)).

**13.** *Id. See also* Del. R. Evid. 403; *Diaz v. State,* 508 A.2d 861, 865 (Del.1986).

██ Generally, "upon the trial of a criminal case, acts, conduct, and declarations of the accused occurring after the commission of an alleged offense which are relevant and tend to show a consciousness of guilt or a desire or disposition to conceal the crime are admissible in evidence."[14] The State argues that evidence of a continued intent to kill Ferrell and to eliminate Ferrell as a witness to the attempted murder meets those criteria for admissibility.[15] We agree.

This Court addressed the same issue in *Stevenson v. State*.[16] In *Stevenson*, the defendant was on trial for the capital murder of Kristopher Heath ("Heath"). There, the State's theory was that Heath was murdered to eliminate him as a witness at Stevenson's pending trial for theft. To establish that motive, the State sought to introduce evidence of the pending theft charges against Stevenson and Heath's role as the State's key witness. The Superior Court concluded that this "other crime" evidence was admissible after conducting an analysis pursuant to D.R.E. 404(b) and this Court's holding in *Getz v. State*.[17]

Although evidence of "other crimes" is generally inadmissible, motive is an exception expressly recognized by Rule 404(b). The State's evidence of Stevenson's "other crimes" at his murder trial established that Heath, as the chief investigating security officer at the department store where the thefts took place, was the primary witness against Stevenson. This Court held that "[t]he record supports the Superior Court's conclusion that this evidence was highly probative to the State's case and not *unfairly* prejudicial to Stevenson."[18]

In Monroe's case, at the time of Ferrell's murder, charges had been pending against Monroe for more than a year for the attempted murder of Ferrell. The State's theory was that Monroe intended to kill Monroe fifteen months later because of personal animus, and also to eliminate Ferrell as a witness at Monroe's attempted murder trial. Here, for the reasons stated in *Stevenson*, we also conclude that the attempted murder evidence was highly probative to the State's murder case and not *unfairly* prejudicial to Monroe.[19]

Nevertheless, Monroe argues that the Superior Court erred in concluding that if the motion to sever were granted, the evidence of the attempted murder would have been admissible at the severed murder trial. In support, Monroe contends that the evidence of the attempted murder would not have been admitted at a severed murder trial because it was sparse and unreliable. Specifically, Monroe argues that the attempted murder evidence would not survive a *Getz* analysis because the eyewitness testimony was not credible. That argument goes to the weight of the State's evidence and not its admissibility. This Court has held that under a *Getz* analysis, sworn testimony constitutes clear and convincing evidence for purposes of

14. *Goldsmith v. State*, 405 A.2d 109, 114 (Del. 1979) (proper to admit "the disputed evidence of defendant's attempts to bribe and criminally assault ... the State's subpoenaed witness").

15. *See Lovett v. State*, 516 A.2d 455, 468–69 (Del.1986).

16. *Stevenson v. State*, 709 A.2d 619 (Del. 1998).

17. *Getz v. State*, 538 A.2d 726 (Del.1988).

18. *Stevenson v. State*, 709 A.2d at 632.

19. *Id. See also United States v. Covington*, 565 F.3d 1336, 1341–42 (11th Cir.2009); *United States v. Siegel*, 536 F.3d 306, 316–19 (4th Cir.2008).

admissibility, with credibility to be decided by the trier of fact.[20]

▪ Whether two crimes are joined for a single trial or the "other crime" evidence is introduced at a separate trial, the most important consideration is to carefully instruct the jury on how to consider and use the evidence of different crimes. If the other crime evidence is introduced at a separate trial pursuant to D.R.E. 404(b), the jury must be given a limiting instruction.[21] That was done in Stevenson's case. If the other crime evidence is presented to sustain a separate charge at a single trial following a multi-count or consolidated indictment, as in Monroe's case, the jury must be carefully instructed on how to evaluate the other crime evidence. That was done in this case.

▪ When the trial judge denied Monroe's pretrial severance motion, he correctly recognized that he should give a "separate charge" instruction to the jury. The trial judge instructed the jury as follows:

> The defendant is charged in Counts 1 through 10 with criminal charges relating to the incident on April 2, 2007 and, in Counts 11 and 12, with criminal charges related to the incident on January 26, 2006. These are separate and distinct offenses and must, therefore, be independently evaluated by you. Just because you reach a conclusion with regard to the other offenses does not mean you need to reach a similar conclusion as to any of the other charges. Again, each charge is separate and distinct, and you must evaluate evidence as

to one independently from evidence as to the others.

This Court has held that such an instruction effectively mitigates any potential prejudice when a defendant is tried for two separate attacks against a single victim.[22] The jury is presumed to have followed that instruction.[23] In this case, the record supports that presumption because the jury acquitted Monroe of the Attempted Murder of Ferrell and the related charges. We hold that the Superior Court did not abuse its discretion in denying Monroe's motion to sever.

### Attempted Robbery Properly Admitted

▪ Before the trial, the State indicated that it would seek to introduce evidence, pursuant to D.R.E. 404(b), of a prior uncharged attempted robbery of Ferrell by Monroe, to show additional evidence of Monroe's motive to murder Ferrell. As has been discussed, establishing motive is a permissible purpose for the use of other crime evidence under D.R.E. 404(b). In *Getz*, we held that evidence of uncharged misconduct can be admitted under D.R.E. 404(b) if:

> (1) the evidence is material to an issue or ultimate fact in dispute in the case; (2) the evidence is relevant to a purpose not inconsistent with the basic prohibition against evidence of bad character or criminal disposition; (3) the uncharged misconduct is proved by plain, clear and conclusive evidence; (4) the act or acts of uncharged misconduct are not too remote in time from the charged offense; (5) the probative value of the evidence is not substantially outweighed

**20.** *Howard v. State*, 549 A.2d 692, 694 (Del. 1988).

**21.** *Getz v. State*, 538 A.2d at 734.

**22.** *Young v. State*, No. 602, 2007, 2008 WL 3892792, at *2 (Del. Aug. 22, 2008).

**23.** *See Capano v. State*, 781 A.2d 556, 589 (Del.2001) ("As a general rule, we must presume that 'the jurors followed the court's instruction.'") (citation omitted).

by the danger of unfair prejudice; and (6) the jury is given an instruction concerning the limited purpose for which such evidence may be heard.[24]

Monroe filed a motion *in limine* to exclude the evidence of an attempted robbery of Ferrell. The Superior Court held a pretrial hearing, at which the State called three witnesses, Ronald Wright, Wisher and Kason Wright. During the pretrial testimony of Kason Wright, the State introduced into evidence a videotaped statement, pursuant to 11 *Del. C.,* § 3507 ("section 3507"). In that statement, Kason Wright said that he was with Monroe when Monroe attempted to rob Ferrell on January 25, 2006.

Based on the combined testimony from the State's three witnesses, the trial judge concluded that the facts of the uncharged attempted robbery were supported by "plain, clear and conclusive evidence." The trial judge denied Monroe's motion *in limine* and ruled that the attempted robbery would be admissible as evidence of motive during Monroe's trial for the attempted murder and actual murder of Ferrell. In making that ruling, the trial judge specifically noted the significance of Karon Wright's section 3507 statement.

At trial, Ronald Wright and Wisher testified consistently with their pretrial testimony at the hearing on Monroe's motion *in limine.* Kason Wright, however, refused to testify at trial, invoking his Fifth Amendment right against self-incrimination. Since Kason Wright did not testify, the trial judge properly ruled that his videotaped section 3507 statement was inadmissible at trial.[25]

Following his conviction for Ferrell's murder, Monroe moved for a new trial, asserting that the jury did not hear "plain,

clear, and conclusive" evidence of the prior uncharged attempted robbery, and therefore, no evidence of that crime should have been admitted at trial. The trial judge denied Monroe's motion for a new trial, ruling that the testimony of Wisher and Ronald Wright provided the "plain, clear, and conclusive" evidence that was necessary to show the attempted robbery and Monroe's motive for the attempted murder and the actual murder of Ferrell. In this appeal, Monroe argues that the Superior Court erred in denying his motion for a new trial.

In his motion for a new trial, Monroe did not contend that the evidence presented at the *pretrial* hearing on his motion *in limine* was not "plain, clear, and conclusive." The only issue raised in Monroe's motion for a new trial was whether the State presented "plain, clear, and conclusive" evidence of the prior uncharged attempted robbery *at trial,* since only Wisher and Ronald Wright testified on the subject. Therefore, the Superior Court had to determine whether the evidence presented to the jury during the *trial,* which did not include either the live testimony or the section 3507 statement of Kason Wright, was "plain, clear, and conclusive."

In ruling on Monroe's motion for a new trial, the Superior Court recognized that neither Ronald Wright nor Wisher testified that they saw Monroe attempt to rob Ferrell by grabbing his necklace. Only Kason Wright asserted (in his prior out-of-court section 3507 statement) that "Main Dane" (Monroe) attempted to steal Ferrell's necklace on January 25, 2006. Nevertheless, the Superior Court held that the eyewitness testimony of Ronald Wright and Wisher was sufficient circumstantial

---

**24.** *Getz v. State,* 538 A.2d at 734.

**25.** *Woodlin v. State,* 3 A.3d 1084, 1087–88 (Del.2010).

evidence to establish proof of the attempted robbery by "plain, clear, and conclusive" evidence, for the following reasons:

Despite the fact that neither Wisher nor Ronald Wright actually saw Defendant [Monroe] commit the robbery, both were able to place Defendant [Monroe] at the scene of the necklace robbery. Additionally, Wisher was able to testify that Kason Wright was fleeing up the street while another individual was "tussling" with Ferrell.

Based on this testimony, this court finds that there was "plain, clear, and conclusive" evidence through the testimony of Wisher and Ronald Wright that tended, if believed by the jury, to show that [Monroe] was involved in the necklace robbery and that the incident could tend to show a motive for [Monroe] to attempt to murder, or to murder, Ferrell. Numerous Delaware cases involving eyewitness testimony have held that the requirement of "plain, clear, and conclusive" is a credibility question for the jury.[26] It was up to the jury to assess the testimony of both Ronald Wright and Jonathan Wisher, determine the credibility of the testimony, and draw any permissible inferences from that testimony. . . . [27]

Even though neither Wisher nor Ronald Wright testified that either saw Monroe rob Ferrell, evidence of that robbery was "plain, clear, and conclusive" because those two eyewitnesses testified that [Monroe] was present when Ferrell was robbed, and the jury was permitted to assess the credibility of that testimony, draw permissible inferences, including whether [Monroe] had a motive to attempt to murder, or to actually murder, consider other evidence in the trial, and consider whether [Monroe] was, indeed, involved in the necklace robbery. Even without the testimony of Kason Wright, evidence of the prior uncharged necklace robbery was "plain, clear, and conclusive."

 It is well established that eyewitness testimony can be used to satisfy the requirement that evidence of uncharged misconduct be "plain, clear, and conclusive."[28] Kason Wright's section 3507 statement, which was not admitted into evidence at trial, would have been *direct* eyewitness evidence of Monroe's attempt to rob Ferrell. However, Wisher and Ronald Wright's eyewitness testimony was *circumstantial* evidence of Monroe's attempt to rob Ferrell.

 We review the denial of a motion for judgment of acquittal *de novo* to determine "whether *any* rational trier of fact, viewing the evidence in the light most favorable to the State, could find the defendant guilty beyond a reasonable doubt."[29] For purposes of that inquiry, this Court does not distinguish between direct and circumstantial evidence of a defendant's guilt.[30] Similarly, for purposes

---

26. *See, e.g., Pope v. State,* 632 A.2d 73, 77 (Del.1993) (holding that "the testimony of various eyewitness accounts and Pope's flight from the scene provided 'conclusive' evidence of that uncharged misconduct."); *Howard v. State,* 549 A.2d 692, 694 (Del.1988) (holding that "[t]he trial judge properly ruled that [eyewitness's] testimony plainly, clearly and conclusively proved the 'other crimes.' [The eyewitness's] credibility was for the jury to assess."); *see also Renzi v. State,* 320 A.2d 711, 712–13 (Del.1974).

27. *See Howard v. State,* 549 A.2d at 694.

28. *Pope v. State,* 632 A.2d at 77.

29. *Seward v. State,* 723 A.2d 365, 369 (Del. 1999) (quoting *Robertson v. State,* 596 A.2d 1345, 1355 (Del.1991)).

30. *Hardin v. State,* 844 A.2d 982, 989 (Del. 2004) (quoting *Cline v. State,* 720 A.2d 891, 892 (Del.1998)).

of deciding whether evidence of a defendant's prior uncharged misconduct is plain, clear, and conclusive, this Court will not distinguish between direct and circumstantial evidence. Since that distinction is the only basis for Monroe's argument, we hold that the record supports the Superior Court's finding that Wisher and Ronald Wright's eyewitness testimony constituted plain, clear, and conclusive circumstantial evidence of Monroe's attempt to rob Ferrell.

### Pretrial Identification Challenges

The trial court held a hearing and briefing on Monroe's motion to suppress out-of-court eyewitness identifications made by Brown and Meier. Following that hearing, the trial judge denied Monroe's motion to suppress the identifications made by both witnesses, finding that the procedures employed by police with regard to Brown and Meier were not impermissibly suggestive and did not result in a violation of Monroe's due process rights. Monroe argues that the Superior Court incorrectly applied the law to the facts of his case.

 A pretrial identification procedure that is "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification" violates the due process clause of the Fourteenth Amendment to the United States Constitution.[31] The fact that a pretrial identification procedure is impermissibly suggestive, however, does not *ipso facto* constitute a due process violation.[32] An impermissibly suggestive identification procedure must also create the danger of an irreparable misidentification.[33] If the trial court determines, under the totality of the circumstances, that a pretrial identification procedure is impermissibly suggestive but the identification is nevertheless reliable, evidence of the pretrial identification will not be excluded at trial.[34]

 In *Younger*, this Court noted that to determine whether a pretrial identification will be admissible as evidence, the trial judge must apply a two-tiered analysis.[35] First, the trial judge must determine whether the pretrial identification procedure was impermissibly suggestive. That is, the trial judge must decide if the identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.[36] Second, if the trial judge determines that a lineup procedure is impermissibly suggestive, he or she must determine whether the identification is nonetheless reliable.[37] To determine the reliability of the identification, the trial judge must apply the *Neil v. Biggers* totality of the circumstances test and consider: first, the opportunity of the witness to view the criminal at the time of the offense; second, the witness' degree of attention; third, the accuracy of the prior description; fourth, the level of certainty demonstrated by the witness at the confrontation; and fifth, the length of time between the crime and confrontation.[38]

---

31. *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); *Younger v. State*, 496 A.2d 546, 550 (Del. 1985).

32. *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977).

33. *Id.*

34. *Id.; Neil v. Biggers*, 409 U.S. 188, 199, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

35. *Younger v. State*, 496 A.2d at 550.

36. *Id.*

37. *Id.*

38. *Neil v. Biggers*, 409 U.S. at 199–200, 93 S.Ct. 375; *Richardson v. State*, 673 A.2d 144, 148 (Del.1996) (citing *Manson v. Brathwaite*, 432 U.S. at 114, 97 S.Ct. 2243).

### Brown's Pretrial Identification

Monroe claims that the police procedures in Brown's out-of-court identification were impermissibly suggestive based on (1) Brown's "fund of knowledge" coupled with police suggestions of Saunders' involvement and Saunders' presence at the police station; (2) Brown's phone discussions with an unknown person; (3) questioning of Brown regarding her knowledge of a link between Monroe and Ferrell; (4) police showing Brown a picture of a white Crown Victoria; and (5) the photo array procedure. In support of that argument, Monroe relies primarily upon the following facts:

> Before Detective Smith began the recorded interview of Brown, she showed her a photo of Ronise Saunders and confirmed that Saunders was her coworker. Brown was allowed to keep her cell phone and made numerous phone calls while the officers were not in the room. Ronise Saunders was transported to the police station for questioning and was placed in the adjacent room to Brown. The adjoining wall had a window that was covered over by brown construction paper. During at least one of her phone calls, Brown referred to a "white lady" who said that the shooter was a person who drove a white "Crown Vic."
>
> Detective Seth Polk testified that he was assisting in the investigation. He showed Brown a photo of a white Crown Victoria that he said was "related to this." Brown stated, "I mean, I don't know if it's related to it, it's just the fact of like, how, you know how something just coincidence, like coincidence." She agreed that it was the make and model of car driven by Ronise's boyfriend.
>
> Detective Smith asked Brown several times whether Andre Ferrell was acquainted with Monroe. After the last

inquiry, Detective Smith asked if Brown were to look at a photo of "somebody we think may have been involved, do you think you would be able to recognize them or not?" Brown agreed to give a try. Later, Polk showed her a six-pack photo lineup, from which she selected Monroe's photograph, stating, "I don't—that looks like him for some crazy—it looks like him."

▮ Monroe contends that the pre-identification procedure was impermissibly suggestive. He does not challenge the mix of six photographs that were shown to Brown. Consequently, Monroe's procedural challenge is based upon what happened at the police station before Brown was shown the six photographs.

In deciding Monroe's motion to suppress Brown's pretrial identification, the trial judge applied the two-step analysis set forth in *Younger*. In doing so, the trial judge considered the same arguments that Monroe raises in this appeal. In applying step one of its *Younger* analysis, the Superior Court began by noting that Monroe is primarily concerned about the pre-identification actions that occurred as part of the exigencies of the immediate ongoing police investigation.

One of the first things that Brown said to Officer Paolo when Officer Paolo arrived at the crime scene was that the shooter looked like her co-worker's (Saunders') boyfriend. As the Superior Court noted, it was therefore logical for the chief investigating officer (Detective Smith) to ask Brown if Ferrell knew Saunders' boyfriend and whether there was any animosity between them. The trial judge found it not surprising that Detective Smith asked Brown those questions about Saunders' boyfriend more than once, since Detective Smith wanted to ascertain if there was a reason for what appeared to be an unprovoked shooting. Similarly, in the context

of the ongoing investigation, showing Brown a photograph of a white Crown Victoria was part of the police effort to confirm immediately that they were looking for the correct type of car that Brown had seen Saunders and her boyfriend driving that evening.

Because Brown told police that the assailant looked like Saunders' boyfriend, the trial judge found it was not unexpected for Saunders to be brought to the police station for investigatory questioning almost immediately. Although Saunders and Brown were in adjoining interrogation rooms that were not soundproof, that appears to have been the result of inadequate space at the police station. Monroe also emphasizes that Brown used her cell phone during the times the police officers were not physically present with her. The trial judge found that it was understandable for the police to allow Brown to use her cell phone. Brown had just witnessed the murder of her boyfriend and she was concerned about her children who had been with her at that time.

Monroe argues that Detective Smith should not have told Brown that the photographs would include someone whom the police suspected. However, immediately prior to showing Brown the lineup, Detective Polk told Brown, "Ok, That's basically what it is. It's six photographs. The person may or may not be in these photographs." Although Monroe quotes one of Brown's statements during her examination of the six photos, the trial judge noted that when Brown viewed the photographic lineup, she identified Monroe's photograph "definitely" as the person who killed Ferrell. Only sometime later was Saunders told she had identified the photograph of Saunders' boyfriend, Monroe.[39]

The foregoing record reflects that, because she was an eyewitness to Ferrell's murder, Brown was the central focus of urgent efforts by the police to gather information about the perpetrator as quickly as possible. There is no doubt that words and actions that precede a photographic lineup can be impermissibly suggestive. In a recent opinion by the New Jersey Supreme Court, the cause for concern about pre-identification actions and words were thoroughly examined.[40] In a comprehensive analysis, the New Jersey Supreme Court emphasized the importance, for purposes of review, of having a record of the words and actions that precede a pretrial identification.

In Monroe's case, everything that Brown heard and said in the interrogation room was tape recorded, including her cell phone calls, when the police officers were not in the room. The trial judge reviewed the tape recordings of Brown and heard

---

**39.** In *Hubbard v. State,* this Court held the fact that police officers informed a witness some time after the photographic lineup that she had successfully identified the perpetrator, did not support an inference that the procedures used during the photographic array itself were impermissibly suggestive. *Hubbard v. State,* 782 A.2d 264 (Del.2001). We note, however, that several studies have concluded post-identification confirmation that the eyewitness correctly identified the suspect can either give the witness a false sense of confidence or falsely enhance their recollection of the event. *See* Gary L. Wells & Amy L. Bradfield, *"Good, You Identified the Suspect": Feedback to Eyewitnesses Distorts Their Reports of the Witnessing Experience,* 83 J. Applied Psychol. 360 (1998); Jeffrey S. Neuschatz et al., *The Effects of Post–Identification Feedback and Age on Retrospective Eyewitness Memory,* 19 *Applied Cognitive Psychol.,* 435, 449 (2005); Gary L. Wells et al., *Distorted Retrospective Eyewitness Reports as Functions of Feedback and Delay,* 9 *J. Experimental Psychol: Applied* 42, 49–50 (2003).

**40.** *State v. Henderson,* 208 N.J. 208, 27 A.3d 872, 2011 WL 3715028 (N.J.Supr. Aug. 24, 2011).

the witnesses' testimony, and concluded that the immediate need to question Brown for investigatory purposes created a pretrial identification situation that was "not perfect." [41] After undertaking part one of its *Younger* analysis, however, the trial judge concluded that "the bottom line" was that Brown's identification of Monroe in the photo lineup was "the product of her own memory and not because of impermissible suggestiveness on the part of the police that gives rise to a very substantial likelihood of irreparable misidentification."

■ Despite reaching that conclusion under the first part of *Younger,* the trial judge did not stop his analysis. He assumed *arguendo* that the pretrial identification procedures were impermissibly suggestive, and proceeded to the second part of a *Younger* analysis, as an alternative basis for his ruling. The trial judge carefully examined the five *Neil v. Biggers'* factors, as follows:

> One is the opportunity of the witness to view the criminal at the time of the crime. Well, here Shameka Brown did have ample opportunity to observe the defendant. It was relatively—he, the defendant, was relatively close to her. She was able to provide a relatively highly detailed description of the shooter. And while the defense suggests that her vision may have been partially obstructed, there's nothing really in the evidence to support that. I think she did have that opportunity.
>
> The witness testified that she had a relatively high degree of attention. She provided a vivid description of the shooting and the defendant. Of course, her focus shifted to her children. That's natural. But I think that she had a high degree of attention paid to the actual incident.
>
> I think Shameka Brown's accuracy of her first description of the defendant to both Corporal Paolo and Detective Smith as pretty accurate. She did describe the defendant as shorter than his actual height, but I think, on balance, she relatively accurately made a prior description.
>
> I think also that Shameka Brown was relatively certain in her identification to Detective Polk. It was a very short time less than three seconds or so, that it took her to identify the defendant. When she asked if the person she picked out of the lineup looked like the person who shot the victim, she said, quote, "yes", definitely, unquote. That's a relatively high standard.
>
> Going to the time between the crime and the confrontation was short. It was just a matter of hours. So, I think, looked at under a totality of the circumstances, even finding, which I don't find, that the initial police actions were impermissibly suggestive, I don't find that it was to the extent that would cause a— give rise to a very substantial likelihood of irreparable misidentification. That's a very high standard.

Thus, after undertaking part two of the *Younger* analysis, the trial judge determined that, under the totality of the circumstances, Brown's pretrial identification of Monroe was reliable and, therefore, sat-

---

41. *See Office of the Attorney General, Attorney General Guidelines for Preparing and Conducting Photo and Live Lineup Identification Procedures* 1 (April 18, 2001); *Nat'l Inst. of Justice, U.S. Department of Justice, Eyewitness Evidence: A Guide for Law Enforcement* 29 (1999). Similar guidance would be helpful to law enforcement agencies in Delaware, if it is not already available. *See* Roy S. Malpass et al., *Lineup Construction and Lineup Fairness, in* 2 The Handbook of Eyewitness Psychology: Memory for People, 155, 156 (R.C.L. Lindsay et al. eds., 2007).

isfied due process. The trial judge's factual findings and legal conclusion are supported by the record.

We hold that the trial judge properly applied both aspects of the two-part *Younger* analysis in admitting into evidence Brown's pretrial identification of Monroe on independent alternative grounds under *Younger*.[42]

### Meier's Pretrial Identification Admissible

■ Monroe argues that police also employed impermissibly suggestive procedures before Meier's out-of-court identification. Meier was interviewed by Detective Smith two days after Ferrell's death and shown a six-person photographic lineup. Monroe argues that Detective Smith's preliminary statements and questions were designed to influence Meier's identification towards Monroe.

The record reflects that Detective Smith asked Meier whether she thought she could make an identification and that Meier indicated she was unsure. Detective Smith told Meier that she wanted Meier to look at the photographs and see if she recognized anybody but if she didn't, that was fine. Meier then reviewed the lineup and selected Monroe, stating "[i]f I had to just flash, I would have to say him." Meier also stated that Monroe's photograph looked most like the person she saw at the crime scene two days earlier.

The Superior Court found Detective Smith's conduct of the photographic lineup and her statements were appropriate under the circumstances. Again applying the two-part *Younger* analysis, the Superior Court ruled that Meier's identification

was not the product of pre-lineup procedures that were so "impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." [43]

Second, and alternatively, the trial judge assumed *arguendo* impermissible suggestiveness and applied the five *Neil v. Biggers'* factors to Meier's identification. The trial judge noted that Meier had two separate opportunities to view Monroe. She first saw him walking through the parking lot after the homicide and then again, running towards the Lexington Green Apartments. The trial judge noted that rather than identifying Monroe unequivocally, Meier actually said Monroe's photograph looked the "most like" the person she saw.

The Superior Court concluded that, under the totality of the circumstances, Meier's out-of-court identification was reliable. We hold that the trial judge's factual findings and legal conclusion are supported by the record. Meier's out-of-court identification of Monroe was properly admitted into evidence. Meier's statements at the time of her identification were known to Monroe's attorney and were proper subjects for cross-examination and closing argument.

### Conclusion

The judgments of the Superior Court are affirmed.

---

**42.** *Younger v. State,* 496 A.2d at 550; *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977).

**43.** *Younger v. State,* 496 A.2d at 550.