Billings, Thomas P., J.
These actions arise from a recapitalization in early 2011 of Verdasys, Inc, a closely held Delaware corporation. Plaintiffs Sander-son and Bucella, who each (and together) owned a minority of Verdasys stock, bring their case as a class action on behalf of all holders of Verdasys common stock. The defendants are in two separately represented groups: the “Corporate Defendants” (Verdasys, the members of its board of directors (the “Director Defendants”), and two founders and former directors (Michels and Birnbaum)), and the “Investor Defendants” (the company’s three largest investors including two fund groups). Both groups have moved to dismiss the Complaint under Rule 12(b)(6) for failure to state a claim, and under Rule 23.1 for bringing directly what the defendants contend should be derivative claims and for failing to make a pre-suit demand.
For the reasons that follow, the defendants’ Motions to Dismiss are ALLOWED IN LIMITED PART, in that Count 3 is dismissed as against the Director Defendants only, and are otherwise DENIED.
I. A NOTE ON PROCEDURE
The complaint has no exhibits attached, though it references and/or quotes from certain documents associated with the recapitalization. With their motion papers, the defendants submitted transactional and disclosure documents to augment the allegations appearing within the four comers of the Complaint. The plaintiffs objected, but submitted one document of their own.
A Rule 12(b)(6) motion is generally addressed only to the allegations made within the four comers of the complaint, lest it be converted to a motion for summary judgment (which may only proceed after all parties have been “given reasonable opportunity to present all materials pertinent to such a motion by Rule 56”). Mass.RCiv.P. 12(b). There are exceptions, however, for documents attached to or otherwise expressly referenced in the complaint, Harhen v. Brown, 431 Mass. 838, 840 (2000), documents of which “the plaintiff had notice” and on which s/he “relied ... in framing the complaint,” Marram v. Kobrick Offshore Fund, Ltd., 442 Mass. 43, 45 n.4 (2004), as well as “matters of public record, orders, [and] items appearing in the record of the case,” Schaer u. Brandéis University, 432 Mass. 474, 477 (2000).[1]
All of the documents submitted by the defendants,[2] as well as the plaintiffs’ single submission, are taken from the disclosure materials distributed to shareholders in advance of the recapitalization. These materials are extensively discussed and quoted in the Complaint (Cmplt., ¶¶53-65), and the submitted excerpts may therefore be considered here. Because the Corporate Defendants’ materials include all of those submitted by the Investor Defendants and more, references herein are to the Corporate Defendants’ submissions (“Corp. Def. Ex._”).
There are additionally unsubstantiated representations of fact in the Corporate Defendants’ brief (p. 7) concerning the outcome of the recapitalization. Some of this material was reiterated at oral argument. I have not considered it in ruling on these Motions, because I may not.[3]
II. FACTS
The allegations of the Complaint (which for purposes of this motion are accepted as true), as occasionally supplemented by the other submitted documents, are as follows.
A. Verdasys and its Financing
Verdasys was founded by defendants Birnbaum and Michels to develop and market software that would enable a user to track the actions of any other user on a personal computer or on a network.[4] It was incorporated in 2003 in Delaware, and is headquartered in Waltham, Massachusetts. At the time of incorporation, Michels became Chairman of the Board and Birnbaum, Chief Executive Officer. Ten million shares of common stock were authorized by the corporate charter, and the directors in February 2003 authorized issuance of five million shares. Verdasys has issued common stock and options over the years as part of its compensation plan, with the result that the great majority of its common shareholders are current or former employees. (Cmplt, ¶¶28-32.)
Looking ahead to the time just before the recapitalization, the following table shows the number of shares issued and outstanding in each class of stock, as well as the holdings of the three Investor Defendants:
[[Image here]]
(Cmplt., OT8-21; Corp. Defs. Ex. A, pp. 8-9.) Roughly speaking, then, just before the recapitalization the *24 common shareholders (including Verdasys employees) had a little under one-quarter of the votes, and the preferred shareholders, the other three-quarters. These last included the Investor Defendants, who collectively held 47.7% of all shares outstanding.
This came about as follows. Soon after they incorporated Verdasys, the founders set about to obtain financing. From a small group of initial investors they raised more than $2 million. The three principal investors—Thomas Hallowell, Christopher Ainley, and Theodore Johnson—were given seats on the Board alongside Michels and Birnbaum, who represented the common shareholders. (Cmplt., ¶¶33-34.)
The next two years saw three more rounds of funding. Each produced a new type of preferred stock, denominated Series A (which raised $8.5 million, including $2 million originally invested by Ainley, Hallowell, Johnson and others for which they were issued Series A preferred shares), B ($8 million, including $5 million from the three Special Situation Funds (collectively, “SSF”)), and C ($11 million, $8 million of which came from Toronto-Dominion Capital (“TD”)), respectively. Each round also resulted in changes to the Board: Peter Loring (of Loring, Wolcott & Coolidge, one of the Series A—and eventually, B and C—investors[5]) became a member; defendant Stettner (an SSF partner) replaced Johnson; and Richard Grinnell (a TD director) became a member. Near the end of October 2006 there were more changes to the Board: defendant Keshian replaced Grinnell as the SSF representative, and defendant Warren replaced Loring to represent Loring Wolcott. (Cmplt., ¶¶35-36.)
Throughout this period, Michels retained effective voting control of the Board, “by virtue of the personal and professional trust that Birnbaum, Ainley, and Hallowell had in him.” Rather than risk losing this with a new round of stock offerings, Michels arranged for debt financing as needed, including an $8 million line of credit from ORIX Venture Financing in September2008. (Cmplt., ¶¶37-38.)
B. Hard Times
Materials submitted by the defendants and properly considered on a Rule 12(b)(6) motion (see Part I, supra) disclose the following. Verdasys operated in the red, with negative cash flows of $12,558,137 in 2008 and $6,034,409 in 2009. By the end of 2009—the last period for which financial statements were available and disclosed to shareholders in connection with the recapitalization—its balance sheet showed total assets of $10,536,639 and total liabilities of $38,603,208, for a total stockholders’ deficit of $28,066,569. (Coip. Def. Ex. D.)
At the close of 2010, Verdasys had junior unsecured debt of$13,805,691 ($12,294,109 interest +$1,511,582 interest), ofwhichjust under half ($6,570,225, or 47.6%) was to the Investor Defendants, who had made loans to Verdasys as well as purchasing its preferred stock; the rest was to Ainley, Johnson, and other individual investors, including some employees. Of the Investor Defendants’ portion, $4.7 million was a 26-month term loan, due October 30, 2012, carrying an interest rate of 13.5% and a 200% premium (i.e., 300% of principal must be paid at maturity). No material default had been declared, but the company was in arrears to the tune of $2,965,000 on its current debt obligations, including $1 million in commissions due to sales and other employees. (Corp. Def. Ex. E, F.)
C. Rift and Reorganization
Returning to the allegations of the Complaint: Directors Keshian and Stettner—the Board representatives for TD and SSF, respectively—came to differ from the four-director majority (Michels, Birnbaum, Ainley, and Hallowell) concerning the company’s strategic direction. Matters came to a head in early 2010, when IBM—with whom Michels and Birnbaum had been negotiating—made an offer to purchase Verdasys, then abruptly withdrew it. Michels and Birnbaum suspected Keshian of sabotaging the deal, and let the Board know they were interested in terminating their employment relationship with the company while remaining on its Board. (Cmplt., ¶¶39-41.)
Keshian and Stettner opposed paying any severance to Michels (whose employment agreement entitled him to a year’s salary as severance) or Birnbaum (who did not have such a contract). When it became clear that a majority of the Board (including, unsurprisingly, Michels and Birnbaum) favored severance packages for both, Keshian and Stettner plotted to have them removed from the Board. They enlisted Nicholas Stamos, a 20% common stockholder and valued Verdasys employee, to motivate his fellow common shareholders to vote Michels and Birnbaum off the Board, and promised in return to endorse Stamos as the Board’s new common shareholder representative. (Cmplt., ¶¶42-44.)
Stamos came through: toward the end of July, he presented Stephen Gregorio, Verdasys’s CFO and a Keshian confederate, with a petition, signed by the owners of a majority of the common stock, to remove Michels and Birnbaum from the Board. Gregorio told him that the petition was not necessary, as “Keshian and Stettner had managed to obtain Michels’s and Birnbaum’s departure from the Board through other means.”[6] (Cmplt., ¶¶45-46.)
Keshian and Stettner reneged on their promise to put Stamos on the board as representative of the commoners, and they also removed Hallowell. This left a four-member Board: Keshian, Stettner, and Warren—representing the interests of TD, SSF, and Loring Wolcott respectively— and Ainley, who remained the sole Board member who owned any common stock. Even Ainley’s Verdasys portfolio was much more weighted toward preferred stock and debt, however, meaning that from mid-2010 forward, the common shareholders lacked any impartial representation at all. This was the Board that devised, proposed, and ultimately implemented the recapitalization. (Cmplt., ¶¶46-48.)
*25 D. The Recapitalization
In early 2011 TD, SSF, and Loring Wolcott, acting through their Board representatives (Keshian, Stettner and Warren), caused Verdasys to engage in a recapitalization. In fact, the plaintiffs allege, the recapitalization was a series of transactions that amounted to “a coun-terintuitive, multi-step artifice that provided no material benefit to the Company,” while enriching the Investor Defendants by increasing their equity percentages at the expense of the common shareholders but with the outward appearance of their approval. (Cmplt., ¶¶49~50.) In summary, what occurred was the following.
1. Every shareholder (common and all three classes of Preferred) received a notice dated January 31, 2011 and a package of supporting materials. The notice said:
The primary goals of the Proposed Refinancing are to reduce the amount of outstanding indebtedness of the Company, to streamline the Company’s capitalization and to modify the Company’s other stockholder-related agreements to facilitate the Company’s efforts to attract new investors to invest additional capital in the Company.
It went on to describe, in ten pages, the various steps of the recapitalization, with certain disclosures and caveats, and requested that each shareholder review, sign, date and return several forms—a Written Consent in Lieu of Special Meeting, and—if the shareholder wished to contribute additional capital-—a Suitability Questionnaire and an IRS Form W-9. Holders of preferred stock were additionally asked to review, sign, date and return a Written Consent to Conversion of Preferred Stock. (Corp. Def. Ex. B.)
2. Each class of preferred shareholder, including the Investor Defendants, agreed to convert its preferred shares into common stock.[7] Shares thus converted were referred to as “Converted Common Stock.” There was, the Complaint alleges, no business reason for the conversion; it was done “solely to project the facade of minority shareholder approval of the Recapitalization.” (Cmplt., ¶¶56-58.) In fact, as outlined below, shares of Converted Common Stock came with built-in economic benefits which original common shares did not have, and whose value depended on which class of preferred stock had been converted.
3. Sometime after February 28, the votes were counted. A majority voted in favor. However:
Verdasys did not establish a procedure for a separate vote of the Company’s pre-Recapitalization common shareholders . . . Indeed, no vote of the Company’s old common stock was ever held. Rather, the Recapitalization Consent purported only to obtain a vote of Verdasys common shareholders after all of the Company’s pre-Recapitalization preferred shareholders converted all of their shares into new Common Stock as part of the Recapitalization—referred to in the Recapitalization as “Converted Common Stock.” (Cmplt., ¶¶ 68, 78.)
4. The rest of the recapitalization now unfolded as outlined in the January 31 notice. First, Verdasys caused a 1:50 “reverse stock split,” meaning that every fifty outstanding common shares (whether original common shares or Converted Common Stock) became one share of “new common” stock, and it filed with the Secretary of State an amendment to its Certificate of Incorporation to reflect the split. (Cmplt., ¶59.)
5. At the same time, Verdasys’s authorized number of shares (all classes) was increased to 33 million; Series A, B and C preferred stock were eliminated; and new classes of Series A-l Preferred stock (13.5 million shares authorized) and Series B-l Preferred stock (5.5 million shares) were created. (Cmplt., ¶60; Exhibit 1 to the Affidavit of Biyan A. Wood, Esq.)
6. The new preferred shares were offered to new common shareholders (i.e., all shareholders) in exchange for cancellation of debt or cash, as follows.
a. B-l Preferred shares were priced at $3.50 per share. Holders of “Junior Indebtedness”—the $13,805,691 referenced earlier, just under half held by Investor Defendants—could surrender their debt for cancellation, for which they would receive an equivalent number of B-1 Preferred shares (in other words: outstanding principal plus interest in dollars, divided by 3.50, equals number of shares). Additionally, any junior debt holder who surrendered 100% of his debt would receive, for each B-l Preferred share thus earned, two shares of common stock.[8] (Cmplt., ¶62; Corp. Defs. Ex. A, sec. 1.2.)
b. Next, every shareholder was eligible—and some apparently had already agreed (Defs. Ex. A sec. 1.3)—to purchase Series B-1 Preferred stock for cash at the $3.50 per-share price, up to a specified number of shares. The limit, called the “Pro Rata Share,” corresponded to the shareholder’s percentage of pre-conversion Verdasys stock, regardless of class, and was computed by multiplying $7.2 million (the hoped-for amount to be raised by the recapitalization) by a fraction consisting of the number of pre-conversion shares held by the shareholder, divided by the total number of pre-conversion shares outstanding. For example, if a shareholder’s total holdings before the conversion (common, any class of preferred, or some combination) had amounted to 10% of total shares outstanding, his Pro Rata Share of the recapitalization would be $720,000, with which it could purchase 205,714 shares of B-l Preferred stock ($720,000 divided by $3.50 per share). Holders of Junior Debt, however, could make the exchange described in the preceding paragraph “even if the number of shares of B-l Preferred to be issued to such holder would exceed such holder’s Pro Rata Share.” (Cmplt., ¶¶63-64; Corp. Defs. Ex. A, sec. 1.4.)
7. Next, there was a “forward stock split,” by which any shareholder who purchased 100% of his Pro Rata Share of B-l Preferred could convert his new common stock to A-l Preferred stock, which the Company *26 valued at $2.528 per share. The conversion formula depended, however, on the class of pre-conversion stock that the new common shares represented, and favored late-infused capital over earlier capital and over common shareholders, as follows:
a. One share of new common stock converted from Series A Preferred could be exchanged for .530063 shares of A-l Preferred;
b. One share of new common stock converted from Series B Preferred could be exchanged for .791139 shares of A-l Preferred;
c. One share of new common stock converted from Series C Preferred could be exchanged for one share of A-l Preferred; and
d. One share of new common stock converted from old common stock could be exchanged for .25 shares of A-l Preferred. (Cmplt., ¶¶65-66; Defs. Ex. A, sec. 1.5.)[9]
8. Shareholders who did not purchase 100% of their Pro Rata Shares retained their new common stock.
E. The Asserted Flaws in the Recapitalization
The plaintiffs assert that the recapitalization was imposed on the corporation (a) by an interested board (b) that was dominated by a controlling shareholder group, (c) without appropriate procedural protections for former common shareholders, (d) whom it disadvantaged (i.e., as to whom it was not “entirely fair”), in several ways.
1.Interested Board
That the Board was not disinterested with respect to the recapitalization is conceded; in fact, the January 31, 2011 notice to shareholders stated on the first page:
There are currently no independent members of the Board. All four (4) members of the Board are interested directors within the meaning of section 144 of the General Corporation Law of the State of Delaware due to the fact that, among other things, they have, or are affiliated with or otherwise have a financial interest in, entities that have indicated to the Company a willingness to participate in the Proposed Refinancing or will have, or are affiliated with or otherwise have a financial interest in entities that will have, a right to participate in the Proposed Refinancing through cancellation of indebtedness which would result in such affiliated entities receiving shares of Common Stock which will not be received by any non-debtholders who participate in the Proposed refinancing. Only investors who participate in the Proposed Refinancing through cancellation of 100% of the indebtedness held by them will be eligible to receive such shares of Common Stock. The terms of the Proposed Refinancing will provide to certain debt holders that participate in the Proposed refinancing the opportunity to receive benefits that other stockholders of the Company will not receive. (Corp. Defs. ExB, p. 1.)
2.Dominance by Common Shareholder Group
The parties disagree sharply, however, on the question of whether the Investor Defendants comprised a single controlling shareholder group which used its control to bring about the recapitalization. In support of their contention that this is so, the plaintiffs have alleged that before the recapitalization, TD owned 21.7% of outstanding Verdasys stock; SSF, 11.5%; and Loring Wood, 14.5%, for a total of 47.7% among them. (Cmplt., OT8-23.) ‘TD, SSF and Loring Wolcott, acting as a single group, planned and caused Verdasys to engage in” the recapitalization. (Cmplt., ¶50.)
By agreement among, and acting on behalf of the Investor Defendants and themselves, Keshian and Stettner completely controlled the Board before and throughout the execution of the Recapitalization. Keshian and Stettner, along with Warren, planned the transactions in advance, set the Board’s agenda to pursue their interests, dominated the Board’s meetings, and acted in coordination at all relevant times. (Cmplt., ¶51.)
3.Lack of Procedural Protections
a. No Independent Valuation.
The recapitalization, although put forward by a majority-interested Board, was not subjected to independent scrutiny, whether by a disinterested Board member,[10] by an independent special committee, or by an advisor or valuation firm. (Cmplt., ¶¶69-76.) This fact was disclosed to shareholders in the January 31 notice, with the explanation that in the Board’s judgment,
the lengthy time needed both to conduct a proper search for such an advisor or firm and for the advisor or firm to conduct a valuation analysis could foreclose opportunities for the Company, divert the attention of management, and not necessarily result in the Company obtaining better value for its stockholders after the payment of a fee to such advisor or firm.
b. No Separate Vote by Old Common Shareholders.
The transaction was put to a vote of all shareholders, but the Complaint alleges that this—seemingly the jewel in the transactional crown—was actually paste, due to the methods employed. The principal complaint is over the fact that the vote was conducted after the preferred shareholders converted their shares to Converted Common stock. In other words: in the only shareholder vote taken, the votes of the “most adversely affected” class—those who had always been common shareholders—were pooled with those of the former holders of preferred stock, whose “Converted Common” shares retained economic advantages (in the coming conversion to A-l Preferred) not enjoyed by “old common” shares. (Cmplt., ¶79.)
Neither the written materials, nor a presentation by Gregorio at an employee meeting on February 11, 2011, informed the commoners that they had a right to vote as a separate class; or specified what percent *27 age of such a vote would be necessaiy to approve the recapitalization; or let it be known that old common shareholders had the power to block the recapitalization if a majority of them voted against it (Cmplt., ¶80), and in fact, that is not the way the votes were counted.
c. Purchased Votes.
Finally, the Complaint alleges, “[t]he vote was rigged . . . Keshian and Stettner bought the votes of a majority or a near majority of the Company’s old common stock holders as a means of surreptitiously obtaining what would look to the outside observer like minority approval of the Recapitalization.” Specifically:
Michels and Birnbaum, who collectively owned 40% of the old common stock, owed the company $50,569 and $119,476, respectively. These debts were disclosed in the exhibits to the January 31 notice, but their embarrassing origins (misappropriation of corporate assets to pay for personal expenses and to support extramarital affairs) were not. The exhibit added, “(t]he Company has not aggressively pursued such amounts although it intends to in 2011.” In fact, Keshian and Stettner promised the two men that if they voted for the recapitalization, the company would forgive their debts and spare them the expense and embarrassment of a lawsuit over their breaches of fiduciary duty. In keeping with this bargain, the company has done nothing to collect from either Michels or Birnbaum. (Cmplt., ¶¶83-86.)
Additionally, Keshian and Stettner approached certain common shareholders who worked in Verdasys’s engineering department and offered to pay for their Pro Rata Share purchase of preferred stock if they voted for the recapitalization. “Many of those employees agreed to the proposal,” and in April 2011, after the vote passed, they were awarded interim “bonuses” in the exact amounts of their respective Pro Rata Share payments. Other common shareholders did not receive such offers; nor were they told of the offers made to the favored few. (Cmplt., ¶¶87-88.)
d. Detriment to Old Common Shareholders
The financial terms of the recapitalization, the Complaint asserts, were unfair to the old common shareholders in several ways, as follows.
First, the recapitalization twice favored investors who held both preferred stock and debt—i.e., the Investor Defendants—because (a) provided they surrendered all of their debt, they received a three-times preference on their purchase of B-l Preferred stock (i.e., $3.50 of surrendered debt bought three shares of B-l Preferred, each of which was priced for others at $3.50 cash), and (b) unlike other shareholders, these debt-holders were able to acquire more than their Pro Rata share of Series A-l Preferred (sic),[11] “all without risking an additional financial investment. In other words, the Director Defendants wrongfully caused Verdasys to issue an excessive number of shares to that group of investors (which included themselves) in exchange for conversion of debt of lesser value.” (Cmplt., ¶90.)
Additionally, the former holders of preferred shares were also favored over old common shareholders—by 4 to 1, in the case of Series C Preferred—in the formula for conversion of new common stock to Series A-l Preferred. (Cmplt., ¶91.)
Finally, the company unfairly undervalued its old common stock at $0.63 per share, while assigning valuations of $2.53, $2.00, and $1.34 for old Series C, B and A Preferred, respectively. (See footnote 9, supra.) Had the Board commissioned a valuation analysis,
it would have determined that the value of Verda-sys’s pre-Recapitalization common stock was much higher than the Recapitalization documents reflected, especially considering the comparatively high post-Recapitalization values set for the Company’s Series B-l Preferred Stock ($3.50 per share) and Series A-l Preferred Stock (approximately $2.62 per share), while post-Recapitalization stock, according to Verdasys, retained an effective value of no more than $0.63 per share—its pre-Recapi-talization price. As a result, common shareholders lost a significant amount and percentage of their equity stake in Verdasys, as well as the related rights attendant to their stock ownership, including without limitation, voting, director representation, and dividend rights. (Cmplt., ¶¶92-94.)
III. CAUSES OF ACTION
The plaintiffs brought the case as a class action on behalf of all common shareholders of Verdasys, excluding Verdasys itself, the Director Defendants, the Investor Defendants, and members of their immediate families, their heirs and assigns, and those in privity with them. The class action status of the case is not directly challenged in either motion to dismiss.
The Complaint asserts the following Counts:
[[Image here]]
*28 IV. DISCUSSION
A. Standard on a Motion to Dismiss
To withstand a Rule 12(b)(6) motion to dismiss, a plaintiffs complaint must contain “allegations plausibly suggesting (not merely consistent with) an entitlement to relief, in order to reflect [a] threshold requirement . . . that the plain statement possess enough heft to sho[w] that the pleader is entitled to relief.” Iannacchino v. Ford Motor Co., 451 Mass. 623, 636 (2008), quoting Bell Atl Corp. v. Twombly, 550 U.S. 544, 555-57 (2007) (internal quotations omitted). While a complaint need not set forth detailed factual allegations, a plaintiff is required to present more than labels and conclusions, and must raise a right to relief “above the speculative level . . . [based] on the assumption that all the allegations in the complaint are true (even if doubtful in fact).” Id. As discussed in Part I, supra, certain extra-Complaint materials—including all of those submitted by either side in this case— may be considered in support or opposition, but bare allegations of fact in the briefs are to be disregarded.
The Corporate Defendants argue: (1) that the plaintiffs’ claims should have been brought in a derivative action, the prerequisites for which (demand on the Board and the shareholders and verification of the Complaint) have not been satisfied; (2) that although they were interested in and at the time of the transaction, they are entitled to the business judgment rule’s lenient standard of review by virtue of the shareholders’ vote approving the transaction; (3) that no disclosure obligations were breached; (4) that even if the entire fairness standard applies there was no breach of fiduciary duty; and (5) that the plaintiffs have not stated a claim against the directors or the corporation for aiding and abetting, conversion, constructive trust, or for a declaratory judgment.
The Investor Defendants add: (1) that they were minority shareholders, not acting as a group; and (2) that the plaintiffs have not stated a claim against them for unjust enrichment, breach of fiduciary duty, equity dilution, constructive trust, or for declaratory judgment.
B. Direct vs. Derivative Claim
Under Delaware law, which determines whether the claim may proceed directly or should have been brought derivatively (see Kamen v. Kemper Financial Services., Inc., 500 U.S. 90, 95 (1991); Johnstonv. Box, 453 Mass. 569, 575 (2009)), the issue normally
tum[s] solely on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?
Tooley v. Donaldson, Lufldn & Jenrette, Inc., 845 A.2d 1031, 1033, 1035 (Del. 2004). Put another way,
a court should look to the nature of the wrong and to whom the relief should go. The stockholder’s claimed direct injury must be independent of any alleged injury to the corporation. The stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation.
Id. at 1039.
Viewed in this light, the assertion that a dispute that pits one class of shareholders against another (or as here, three others) needs to be brought on behalf of all shareholders seems puzzling. Although the Complaint alleges that the Investor Defendants were paid disproportionately for their stock in relation to holders of old common stock, the claim is not simply that they enriched themselves at the corporation’s expense, but that they thereby contrived to obtain more of it for themselves, leaving less of it in the hands of the commoners.
As it happens, the Delaware courts have addressed this issue before.
There is ... at least one transactional paradigm—a species of corporate overpayment claim—that Delaware case law recognizes as being both derivative and direct in character. A breach of fiduciary duly claim having this dual character arises where: (1) a stockholder having majority or effective control causes the corporation to issue “excessive” shares of its stock in exchange for assets of the controlling stockholder that have a lesser value; and (2) the exchange causes an increase in the percentage of the outstanding shares owned by the controlling stockholder, and a corresponding decrease in the share percentage owned by the public (minority) shareholders. Because the means used to achieve that result is an overpayment (or “over-issuance”) of shares to the controlling stockholder, the corporation is harmed and has a claim to compel the restoration of the value of the overpayment. That claim, by definition, is derivative. But, the public (or minority) stockholders also have a separate, and direct, claim arising out of that same transaction. Because the shares representing the “overpayment” embody both economic value and voting power, the end result of this 1ype of transaction is an improper transfer—or expropriation—of economic value and voting power from the public shareholders to the majority or controlling stockholder. For that reason, the harm resulting from the overpayment is not confined to an equal dilution of the economic value and voting power of each of the corporation’s outstanding shares. A separate harm also results: an extraction from the public shareholders, and a redistribution to the controlling shareholder, of a portion of the economic value and voting power embodied in the minority interest. As a consequence, the public shareholders are harmed, uniquely and individually, to the same extent that the controlling shareholder is (correspondingly) benefitted. In such circumstances, the public shareholders are entitled to recover the value represented by that overpayment—an entitlement that may be claimed by the public shareholders *29 directly and without regard to any claim the corporation may have.
Gentile v. Rossette, 906 A. 2d 91, 99-100 (Del. 2006).
“Effective control” may mean majority ownership, or it may mean control over the business and affairs of the corporation, In re PNB Holding Co. Shareholders Litigation, 2006 WL 2403999 at *9 (Del.Ch. Aug. 18, 2006), citing Kahn v. Lynch Communication Systems, Inc., 638 A.2d 1110, 1113-14 (Del. 2006), and it may be wielded by “a single person or entity,” or by a group.
[A] number of shareholders, each of whom individually cannot exert control over the corporation (either through majority ownership or significant voting power coupled with formidable managerial power), can collectively form a control group where those shareholders are connected in some legally significant way—e.g., by contract, common ownership, agreement, or other arrangement—to work together toward a shared goal.
Dubroff v. Wren Holdings, 2009 WL 1478697, at *3 (Del.Ch. May 22, 2009), citing In re PNB Holding, 2006 WL 2403999 at *10 (Del.Ch. 2006).
In this case, the Complaint amply alleges that the Investor Defendants had a commonality of interest, that they controlled the Board, and that by agreement they worked together to effect the recapitalization for their own ends, at the expense of the common shareholders. The case was properly brought as a direct action.
C. Standard for Review of the Board’s Actions
The outside observer may be struck by how much of Delaware corporate litigation seems to be devoted to the question of what standard the court is to apply when reviewing an act of the Board of Directors—the “business judgment rule,” the “entire fairness” standard, or the intermediate (and only occasionally applicable) “heightened scrutiny” standard.[12] On further reflection this is unsurprising, however, considering both the occasional complexity and the often outcome-determinative quality of the selection.
The business judgment rule is the default standard of review. It presumes that “in making a business decision the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company.” “[W]here the business judgment [rule] presumptions are applicable, the board’s decision will be upheld unless it cannot be attributed to any rational purpose.”
Reis v. Hazelett Strip-Casting Corp., 28 A.3d 422, 457 (Del.Ch. 2011), quoting Aronson v. Lewis, 473 A.2d 805, 812 (Del. 1984) (overruled on other grounds, Brehm v. Eisner, 746 A.2d 244 (Del. 2000)), and In re Walt Disney Co. Derivative Litigation, 906 A.2d 27, 74 (Del. 2006) (internal quotation marks omitted).
Entire fairness, on the other hand,
is Delaware’s most onerous standard. When a party challenging a board’s decision alleges and later proves facts sufficient to overcome the business judgment rule, “the burden then shifts to the director defendants to demonstrate that the challenged act or transaction was entirely fair to the corporation and its shareholders.” Once entire fairness applies, the defendants must establish “to the court’s satisfaction that the transaction was the product of both fair dealing and fair price.” “Not even an honest belief that the transaction was entirely fair will be sufficient to establish entire fairness. Rather, the transaction itself must be objectively fair, independent of the board’s beliefs.”
Reis at 459 (emphasis in original), quoting Wait Disney, 906 A.2d at 52; Cinerama, Inc. v. Technicolor, Inc., 663 A.2d 1156, 1163 (Del. 1995); and Gesoff v. IIC Indus., Inc., 902 A.2d 1130, 1145 (Del.Ch. 2006). “[I]f actual self-interest is present and affects a majority of directors approving a transaction, the entire fairness standard applies.” Cinerama, Inc. v. Technicolor, Inc., 663 A.2d 1156, 1168 (Del. 1995).
Here, the Complaint alleges just such a case, and as noted above, the directors conceded going into the transaction that they were not disinterested. By statute (8 Del. C. §144), however, Delaware has created several safe harbors that allow even an interested Board to function. The defendants invoke one of these, under which a transaction is not void or voidable solely on account of director self-interest, provided
[t]he material facts as to the director’s or officer’s relationship or interest and as to the contract or transaction are disclosed or are known to the stockholders entitled to vote thereon, and the contract or transaction is specifically approved in good faith by vote of the stockholders.
Id. at §144(a)(2). “Thus, in a classic self-dealing transaction the effect of a fully-informed shareholder vote in favor of that particular transaction is to maintain the business judgment rule’s presumptions.” Solomon v. Armstrong, 747A.2d 1098, 1115 (Del.Ch. 1999).
The plaintiffs seek to distinguish this case from Solomon by characterizing the recapitalization as a “minority freeze out accomplished through a reverse stock split” by a controlling shareholder group, which no shareholder vote could save from entire fairness review. They are correct that in the case of a reverse stock split[13] or cash-out merger,[14] by which a controlling shareholder or cabal forces the minority out entirely, the “exclusive standard of judicial review” is “entire fairness,” although “approval of the transaction by an independent committee of directors or an informed majority of minority shareholders” would shift the burden of proof on the issue of fairness to the plaintiff. Kahn v. Lynch Communication Systems, Inc., 638 A.2d 1110, 1117 (Del. 1994); Reis at 460.
*30 In this case, although their percentage participation was diminished, “old common” shareholders were not eliminated from the company altogether, and neither side cites to a case directly addressing the effect of a shareholder vote where dilution, not an outright freeze-out, is alleged. I will assume for now, therefore, that in some circumstances, approval of the recapitalization by shareholder vote could entitle the defendants to review under the business judgment rule.
Not just any vote, however, will do. ‘The cleansing effect of ratification depends on the intuition that when most of the affected minority affirmatively approves the transaction, their self-interested decision to approve is sufficient proof of fairness to obviate a judicial examination of that question.” PNB, supra, at *15. Ideally, therefore, the transaction should be conditioned in advance on majority approval of “a majority of the minority.”
Under Delaware law, however, the mere fact that an interested transaction was not made expressly subject to a non-waivable majority-of-the-minorily vote condition has not made the attainment of so-called “ratification effect” impossible. Rather, outside the [Kahn u.) Lynch context, proof that an informed, non-coerced majority of the disinterested stockholders approved an interested transaction has the effect of invoking business judgment rule protection for the transaction and, as a practical matter, insulating the transaction from revocation and its proponents from liability.
Id. at *14.[15]
The mere fact that a majority of the stock—interested and disinterested combined—voted to approve the recapitalization, therefore, does not automatically insulate it from entire fairness review. Here, as in the PNB case, “the defendant-directors created, by definition, a transactional context that created subclasses of the ... common stockholders,” some of whom stood to benefit from the transaction and others of whom, it is plausibly alleged, would suffer. PNB at *12. Although, at the time the votes were counted, there was nominally only one class of stock (common), in reality there were four discrete interest groups, because the economic advantages of ownership of a share of common stock would very soon depend—if the recapitalization was approved—on whether it had been common all along, or whether it was converted from preferred stock (and which class). When it came time to convert to A-l Preferred (assuming the shareholder had purchased his full Pro Rata Share of B-l Preferred), a “common” share that had been converted from Class C preferred stock was worth four times the value of a common share that had been bom common, and shares converted from Class B or Class A stock enjoyed similar, though quantitatively lesser, advantages. As in a certain dystopian agricultural community, “All animals are equal, but some animals are more equal than others.”[16]
For this interested transaction to be cleansed by shareholder action, therefore, there would at least have to be a vote in favor by a majority of the non-converted common stock. On the facts alleged in the Complaint, however, even this would not come close: at least four “old common” shareholders—including two (Michels and Bimbaum) who together held 40% of the old common—were bribed in secret by members of the Board, and that at least one more (Ainley) was conflicted due to the preponderance of debt and preferred stock in his portfolio; none of these five, therefore, could be called disinterested. The Complaint does not give a tally of the votes, but at the pleading stage, at least, it provides adequate support for the plaintiffs’ allegations of disabling procedural and substantive defects in the shareholder vote, and for their contention that the transaction is therefore subj ect to entire fairness review.
D. Entire Fairness
The stringency of the entire fairness standard, and most especially, the fact that the defendants bear the burdens of production and proof, suggests that it will be the rare entire fairness case that is dismissed on a Rule 12(b)(6) motion.
The concept of fairness has two basic aspects: fair dealing and fair price. The former embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained. The latter aspect of fairness relates to the economic and financial considerations of the [transaction], including all relevant factors .. .
Weinberger v. UOP, Inc., 457A.2d 701, 711 (Del. 1983). The analysis “is not a bifurcated one as between fair dealing and price. All aspects of the issue must be examined as a whole since the question is one of entire fairness.” Id.
The Complaint adequately alleges that the process by which the recapitalization was approved was unfair— that representatives of the common shareholders were first removed from the Board and not replaced; that the valuations and other financial terms of the transaction were set by an interested Board without input from outside advisors or an independent special committee; and that the shareholder vote approving it was defective for the reasons discussed in the preceding section.
The Complaint also enumerates several ways in which holders of non-converted old common shares were disadvantaged relative to the Investor Defendants: Without outside or disinterested input, shares of old Class A, B and C Preferred stock were valued at $1.34, $2.00, and $2.53 respectively, while old common stock was valued at $0.63; junior debt—half of which was held by the three Investor Defendants—could be exchanged for B-l Preferred stock worth three times the face amount of the debt; and the former A, B and C Preferred shareholders could then obtain A-l Preferred stock in excess of their Pro Rata Share, at conversion ratios that were between two to four times as favorable as that offered common shareholders.[17] The Complaint thus adequately alleges *31 that the recapitalization was not entirely fair to members of the plaintiff class.
E. Specific Counts
Counts 1 and 2 (breach of fiduciary duty against the Director Defendants and the Investor Defendants) both state a claim. Directors owe the corporation and its shareholders “an uncompromising duty of loyalty.” Weinberger at 710.
A public policy, existing through the years, and derived from a profound knowledge of human characteristics and motives, has established a rule that demands of a corporate officer or director, peremptorily and inexorably, the most scrupulous observance of his duty, not only affirmatively to protect the interests of the corporation committed to his charge, but also to refrain from doing anything that would work injury to the corporation, or to deprive it of profit or advantage which his skill and ability might properly bring to it, or to enable it to make in the reasonable and lawful exercise of its powers. The rule that requires an undivided and unselfish loyalty to the corporation demands that there shall be no conflict between duty and self-interest.
Id., quoting Guth v. Loft, Inc., 5 A.2d 503, 510 (Del. 1939). Controlling shareholders, too—which the Complaint has adequately alleged the Investor Defendants were—similarly “owe their corporation and its minority shareholders a fiduciary obligation of honesty, loyalty, good faith and fairness.” Singer v. Magnavox Co., 380 A.2d 969, 977 (Del. 1977).
Count 3 (“Equity Dilution,” against Director Defendants and Investor Defendants) also states a claim, at least against the Investor Defendants. “Equity dilution” is a shorthand term for the claim recognized in Gentile v. Rossette, supra, “aris[ing] where: (1) a stockholder [or controlling group] having majority or effective control causes the corporation to issue ‘excessive’ shares of its stock in exchange for assets of the controlling stockholder that have a lesser value; and (2) the exchange causes an increase in the percentage of the outstanding shares owned by the controlling stockholder, and a corresponding decrease in the share percentage owned by the public (minority) shareholders.”
The claim, however, would seem to be one against the controlling stockholder(s) alone. None of the remedies discussed in Gentile (in which the directors were not named)—cancellation of the excess shares or restoration of their value (906 A.2d at 98), “damages, equal to the fair value of the shares representing the overpayment” [id. at 103), and/or consequential damages resulting from the majority’s “extraction of value” from the corporation (id. at 98)—seem appropriate or germane to directors in their capacity as such (though they may be liable for breach of their fiduciary duties, if proved). Count 3 is therefore dismissed as against the Director Defendants but will remain as against the Investor Defendants.
Count 4 (seeking a declaratory judgment against Verdasys, the Director Defendants, and the Investor Defendants) states a claim. The declaration sought is “that the Recapitalization is a nullity and contrary to law and that all debt holders and shareholders in Verdasys shall be returned to the respective economic positions they held as equity holders and creditors prior to the Recapitalization.”
Both Massachusetts and Delaware have adopted the Uniform Declaratory Judgment Act, under which “[flurther relief based on a declaratory judgment or decree may be granted whenever necessary or proper.” Mass. Gen. Lawsc. 231 A, §5; lODel.C. §6502. In an appropriate case, Delaware law affords relief in the form of rescission of an unlawful corporate transaction, “or (in cases where rescission is impractical and the circumstances otherwise warrant) a recovery of the monetary equivalent of rescission.” Nebel v. Southwest Bancorp, Inc., C.A. No. 13618, 1995 WL 405750, at *2 (Del.Ch. July 5, 1995) (merger); see Dubroff, supra (recapitalization).
Count 5 (for unjust enrichment against the Investor Defendants) likewise states a claim. “[U]njust enrichment requires ‘(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law.’ ” Dubroff, quoting Latesco, L.P. v. Wayport, Inc., 2009 WL 2246793, at *9 n.33 (Del.Ch. July 24, 2009), and Addy v. Piedmonte, 2009 WL 707641, at *22 (Del.Ch. Mar. 18, 2009). The Complaint adequately alleges that the Investor Defendants were unjustly enriched due to unfair economic advantages that the recapitalization conferred on holders of the company’s preferred stock and unsecured debt, and that there was no legitimate purpose for this and ho benefit conferred on Verdasys.
Count 6 (for conversion against the Director Defendants) also survives. “Conversion is ‘any distinct act of dominion wrongfully exerted over the property of another, in denial of [the plaintiffs] right, or inconsistent with it.’ ” Kuroda v. SPJS Holdings, L.L.C., 971 A.2d 872, 890 (Del.Ch. 2009), quoting Drug, Inc. v. Hunt, 168 A 87, 93 (Del. 1933). Although extending the law of conversion to cover a regular-on-its-face but legally flawed corporate transaction might seem a bit of a stretch, it seems that Delaware law has done just that, and not recently. Under settled Delaware law, “[a] stockholder’s shares are converted by ‘any act of control or dominion . . . without the [stockholder’s] authority or consent and in disregard, violation, or denial of his rights as a stockholder of the company.’ ” Arnold v. Society for Savings Bancorp, Inc., 678 A.2d 533, 536 (Del. 1996), quoting Drug, Inc. and Layman v. F.F. Siocomb & Co., 76 A. 1094, 1095 (Del. 1909)); see Nikolouzakis v. Exinda Corp., 2012 WL 3239853 (U.S.D.C. D.Del. 2012) (conversion claim in the context of corporate refinancing, employee termination, and cancellation of nearly-vested stock options). This being so, the claim properly lies against the directors, who implemented the recapitalization in their official capacities.[18]
*32 Count 7 (Constructive Trust against Director Defendants and Investor Defendants), as the defendants point out, might more gracefully have been asserted as a prayer for relief. Although the constructive (or resulting) trust is an equitable theory known to both Massachusetts and Delaware law, see Adams v. Jankouskas, 452 A.2d 148, 152 (Del. 1982), it is a remedy, not a separate cause of action, and would fall away if the plaintiffs failed to succeed on the substantive claims for restoration of the status quo ante. The issue is stylistic, however, and the Complaint elsewhere makes allegations which, if proved, may entitle the plaintiffs to this relief. Count 7 will remain.
Finally, Count 8 (Aiding and abetting breach of fiduciary duty against Michels and Birnbaum) states a claim.
“A third party may be liable for aiding and abetting a breach of a corporate fiduciary’s duty to the stockholders if the third party ‘knowingly participates’ in the breach.” To survive a motion to dismiss, the complaint must allege facts that satisfy the four elements of an aiding and abetting claim: “(1) the existence of a fiduciary relationship, (2) a breach of the fiduciary’s duty, ... (3) knowing participation in that breach by the defendants,” and (4) damages proximatefy caused by the breach . . . Knowing participation in á board’s fiduciary breach requires that the third party act with the knowledge that the conduct advocated or assisted constitutes such a breach.
Malpiede v. Townson, 780 A.2d 1075, 1096-97 (Del. 2001) (footnotes omitted). The Complaint adequately alleges each of these elements.
ORDER
For the foregoing reasons, the defendants’ Motions to Dismiss are ALLOWED IN LIMITED PART, in that Count 3 is dismissed as against the Director Defendants only, and are otherwise DENIED.

For what it’s worth, the Delaware courts operate under more or less the same rules. See Vanderbilt Income & Growth Assocs. v. Arvida/JMB Managers, Inc., 691 A.2d 609, 613 (Del. 1996).

investor Defendants’ Exhibits A-C and Corporate Defendants’ Exhibits A-G. Investor Defendants’ A and Corporate Defendants’ Exhibit D is the Verdasys 2008-2009 financial statements. Unlike the others, this document does not suggest on its face (except by inference from the Bates numbers) that it was part of the disclosure package, but the Stock Purchase and Recapitalization Agreement (Corporate Defendants’ Ex. A) indicates that it was.

The restricted field of view on a Rule 12(b)(6) motion does not, of course, foreclose the possibility that on another day and in a different procedural posture, the defendants might demonstrate that Verdasys was hopelessly insolvent and its common shares worthless, and that the recapitalization was fair, beneficial to all, and necessary to the company’s survival, as they maintain. It might be so, or it might not. For now, however, I am limited to the non-conclusory allegations of the complaint and the extra documents properly submitted by both sides.

According to the complaint, the idea came to Birnbaum and Michels when they watched their former employer, a pharmaceutical company, struggle in an investigation of three other employees’ alleged attempt to misappropriate proprietary information belonging to the company.

Loring Wolcott invested in Verdasys via defendant Ver-dasys Inc. Investment Trust and, later on, through defendants Verdasys Inc. Series B Convertible Preferred Investment Trust and Verdasys Inc. Series C Convertible Preferred Investment Trust.

What sort of means, the Complaint does not say. It does suggest that this had been the plan all along, and that Stamos’s petition was a “back-up plan.”

This required the consent of at least 80% of all preferred stock as a whole, or a majority of Series A, Series B, and Series C preferred stock, each voting as a separate class. (Cmplt., ¶57)

Although this is reminiscent of the 200% premium on the Investor Defendants’ 26-month term loan, it is not clear that all junior debt carried a similar premium. Nor is there any allegation, one way or the other, as to whether the premium had received the sanction of a disinterested Board in the first place.

The preferred share conversion ratios reflected the differences in the prices upon issuance among classes (Series A, $1.34, Series B, $2.00, and Series C, $2.528). See Corp. Def Ex. Dp. 15. The common share ratio, the plaintiffs allege, was arbitrary and unfair.

In fact, the Complaint alleges, there were no disinterested Board members at the time.

I believe this should read “B-l Preferred.”

This last “applies when the realities of the decision-making context can subtly undermine the decisions of even independent and disinterested directors,” the prototypical case being “resistance to a hostile takeover, where there is an ‘omnipresent specter’ that target directors may be influenced by and act to further their own interests or those of incumbent management, ‘rather than those of the corporation and its shareholders.’ ” Reis at 457, quoting Unocal Corp. v. Mesa Petroleum Co.,493 A2d 946, 954 (Del. 1985). In such a case, “the defendant fiduciaries bear the burden of persuasion to show that their motivations were proper and not selfish” and that “their actions were reasonable in relation to their legitimate objective.” Id., quoting Mercierv. Inter-Tel (Del), Inc., 929A.2d 786,810 (Del.Ch. 2007). Neither side advocates for the enhanced scrutiny standard in this case.

For example, in Reis the majority implemented a 1:400 reverse split with a prohibition on fractional shares. Because the majority shareholder (of two) held 800 shares and the minority 350, the minority had to cash out.

In a cash-out merger, the acquiring company buys the stock of the target company for cash, such that the target’s shareholders have no interest in the company resulting from the merger.

But cf. John Q. Hammons Hotels Inc. Shareholder Litigation, 2009 WL 3165613 (Del.Ch. 2009) at *13 (at least in the merger context, the express “preconditions to the transaction” must include requirement that a majority of all minority stock (not just of minority votes cast) must approve the transaction, and that the requirement may not be waived by special committee; “(i]n other words, the lack of such requirements cannot be ‘cured’ by the fact that they would have been satisfied if they were in place”).

G. Orwell, Animal Farm, Ch. 10 (1945).

The conversion ratios corresponded to the valuations set by the Board.

The plaintiffs were not, as the defendants maintain, required to make a pre-suit demand for return of the converted property. Assuming there still is such a requirement, but see 10 Del.C. §3907, it does not apply where the defendant’s possession of the plaintiffs property was wrongful from the beginning, as the Complaint alleges. CITComm. Finance v. Level 3 Comm, 2008 WL 2586694 at *2 (Del.Super. June 6, 2008).