Billings, Thomas P., A.J.
The plaintiff, Eric C. Wilkie (“Wilkie”) commenced this action with a nine-count complaint against defendants New England Technical Sales, Inc. (“NETS”), Keith Caveney (“Caveney”), Thomas J. Caveney, Peter Kinney, and Online Marketing Solutions, Inc. concerning the termination of and proper compensation due Wilkie. Wilkie now moves for summary judgment on Count I and Count II. Count I asserts a claim against defendants NETS, Caveney, and Thomas J. Caveney under the Wage Act, G.L.c. 149, §148, for failure to pay earned wages. Count II asserts a claim of contract against NETS.
For the reasons that follow, the plaintiffs Motion for Summary Judgment is ALLOWED IN PART and DENIED IN PART.

FACTS

The facts, either undisputed or taken in the light most favorable to the defendants, are as follows.
In January 1995, NETS hired Wilkie as a sales representative. Under the 1995 contract, Wilkie was entitled to an annual salary of $55,000, a quarterly commission on sales generated by Wilkie on total sales excess of $100,000,[2] and several additional benefits. The 1995 contract included a severance agreement whereby Wilkie would be entitled to a commission on any sales booked prior to his termination.
During the first three years of his employment Wilkie did not receive any commissions under his employment contract. Over the course of his employment prior to 1999, the employment contract was orally modified to step up the base salary received. In 1999, NETS and Wilkie orally modified the 1995 contract to require Wilkie’s total compensation to be derived from his generated sales. The compensation included a guaranteed $125,000, to be paid in biweekly increments. In addition, Wilkie received a commission on all generated sales, net of the $125,000 and all expenses.
The modification took effect on January 1, 2000. Thereafter, Wilkie was issued monthly commissions, although the commissions frequently were paid late.
In the winter of 2001, NETS grew disaffected with Wilkie and attempted to negotiate a modification of his compensation arrangement for 2002. After Wilkie refused several proposals, NETS terminated him on February 11, 2002.
On February 15, 2002, NETS paid Wilkie his commissions due for the year 2001. Caveney withheld payment on any commissions due for 2002, believing that the employment contract as modified in 1999 was ineffective because of the parties’ inability to agree on a renegotiated contract. The commissions due Wilkie for generated sales between January 1, 2002 and February 11, 2002 amounted to $37,459.67.
Following the termination of the employment arrangement, NETS offered to enter into a severance agreement with Wilkie. Under that agreement, NETS offered to continue the guaranteed payments for roughly 13 weeks ($32,623.68) and to continue health insurance payments for the same duration. The severance agreement would have required Wilkie to release NETS and its officers from all liabiliiy, claims or causes of action, and required Wilkie to agree to a non-competition clause. Caveney has testified by affidavit that Wilkie “verbally accepted the severance *187 offer, but did not sign the letter”; Wilkie evidently disputes the verbal acceptance. Thereafter, NETS provided an amount described in the record only as “nearly $10,000,” and two months of health coverage, to Wilkie.
On April 8, 2002, Wilkie’s counsel sent NETS a demand letter for unused vacation time and commissions. NETS responded through counsel on April 23. This letter, while denying certain of Wilkie’s allegations, stated that NETS had determined that “the total amount of unpaid commissions now due him is $27,821.61.” A follow-up letter dated May 1, 2002 updated this computation with “additional information . . . relative to orders ‘booked’ through the date of Mr. Wilkie’s departure (February 11, 2002).” This showed gross commissions due in the amount of $35,108.60, from which NETS deducted health insurance premiums paid for March and April and an overpayment of 2001 commissions. Thus netted out, “the actual amount now due Mr. Wilkie is $37,459.67,” which counsel stated NETS was prepared to pay but “will require a release before doing so.”
Wilkie did not respond to this offer. Instead, on May 3, 2002, he filed a claim with the Attorney General alleging a violation of G.L.c. 149, §§148 and 150 (herein, the “Wage Act”). The Attorney General issued a right-to-sue letter, authorizing Wilkie to pursue the matter privately. This action followed. The plaintiff now moves for partial summary judgment on Count I (Wage Act), and Count II (breach of contract).[3]

DISCUSSION

Summary judgment shall be granted where there are no genuine issues as to any material fact and where the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c); Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue, and that the summary judgment record entitles the moving party to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). The moving party may satisfy this burden either by submitting affirmative evidence that negates an essential element of the opposing party’s case or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of his case at trial. Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). Once the moving party establishes the absence of a triable issue, the party opposing the motion must respond and allege specific facts establishing the existence of a genuine issue of material fact. Pederson, 404 Mass. at 17. The nonmoving party cannot defeat a motion for summary judgment by resting on his pleadings and mere assertions of disputed facts. LaLonde v. Eissner, 405 Mass. 207, 209 (1989). In deciding a motion for summary judgment, the court may consider pleadings, depositions, answers to interrogatories, admissions on file and affidavits. Community Nat’l Bank, 369 Mass. at 553.

A. Liability

The Wage Act mandates the prompt payment of wages to employees.[4] The purpose of the Act is “to assure that employees are paid their wages on a weekly basis.” Commonwealth v. Savage, 31 Mass.App.Ct. 714, 714 (1991). Included in the statute is a provision that protects compensation in the form of commissions:
This section shall apply, so far as apt, to the payment of commissions when the amount of such commissions, less allowable or authorized deductions, has been definitely determined and has become due and payable to such employee, and commissions so determined and due such employees shall be subject to the provisions of section one hundred and fifty.
G.L.c. 149, §150. Although violation of the Wage Act is criminal, the Act also provides a cause of action to employees whose wages have been wrongfully withheld.[5]
For an employee to recover damages for withheld commissions, the commission must be “definitely determined.” G.L.c. 149, §148. Massachusetts courts have held that the term “commission” refers to “employees who would ordinarily be paid on a weekly basis . . . and for whom commissions constitute a significant part of weekly income.” Savage, 31 Mass.App.Ct. at 716; Dennis v. Jager, Smith & Stetler, P.C., 11 Mass. L. Rptr. No. 24, 567, 568 (July 17, 2000) (Ball, J.).
For purpose of the Wage Act, payments qualify as commissions under the Act only if they satisfy a series of factors: regularity of commission, regularity of commission payment, relation between salary and commission, and absence of triggering contingencies. Courts have held that where the payment is erratic, such as a yearly bonus, the payment does not constitute a commission as defined under the Act. Dennis, 11 Mass. L. Rptr. at 568. Similarly, where payments are distributed quarterly, it has been held that the payments are too remote to constitute commissions under the Act. Locke v. Sales Consultants of Boston, Inc., 13 Mass. L. Rptr. No. 7, 164, 166 (June 25, 2001) (Hinkle, J.). In addition, where an employee’s primary income is a salary, several decisions have held that any additional payments do not constitute “commissions” under the Act. Richards v. Datatec Systems, Inc., 19 Mass. L. Rptr. No. 15, 343, 345 (June 20, 2005) (Burnes, J.) (“[T]he commissions must be part of an *188 employee’s regular compensation, not episodic payments from special events’’); Okerman v. VA Software Corp., 16 Mass. L. Rptr. No. 20, 513, 518-19 (August 25, 2003) (Cratsley, J.); Dennis, 11 Mass. L. Rptr. at 568.
Finally, payments which depend on contingencies, such as achievement of sales goals, are not “commissions” unless the contingencies have been satisfied prior to termination of employment or the contingencies are those inherently associated with a commission, such as consummation of the underlying sale. Okerman (“contingent commissions are protected by the Wage Act once the contingency occurs”); Lohnes v. Darwin Partners, Inc., 15 Mass. L. Rptr. No. 7, 157, 158-59 (September 30, 2002) (Gants, J.) (all commissions involve contingencies; the Act requires that the contingency must already have occurred); Okerman v. VA Software Corp., Civil No. 01-01825 (Norfolk Super.Ct. June 25, 2002) (Locke. J.) (contingency on sales goals removes payment from the Act); Dennis, 11 Mass. L. Rptr. at 568 (payment triggered by contingencies is excluded). Nevertheless, “once the amount of commissions owed has been ‘definitely determined’ and once they are due to be paid pursuant to the parties’ agreement or arrangement, failure to pay them promptly is a violation of §148 and recovery for said violation may be had under §150.” Klint v. J&J Associates, Inc., 9 Mass. L. Rep. No. 7, 153, 155 (December 7, 1998) (Sosman, J.).
In the present case, the plaintiffs compensation constituted commissions as required under the Act. It was derived entirely from commissions based on generated sales, with a portion ($125,000) guaranteed. Wilkie was paid in bi-weekly allotments, supplemented by additional monthly surplus. See Beaule v. M.S. Inserts and Fasteners Corp., 17 Mass. L. Rptr. No. 27, 623, 625 (June 7, 2004) (Kern, J.) (monthly commissions are sufficiently regular to fall under the Act). In addition, his commissions were not dependent on any contingencies except for the booking of sales, which was accomplished here prior to the date of his termination.[6] Finally, on April 23, 2002 (and as later amended on May 1, 2002), NETS definitely determined the commission due Wilkie for his work between January 1 and February 11. At that point if not before, payment was immediately due Wilkie. Id.
NETS, while acknowledging that it was indebted to Wilkie for commissions in a particular, fixed amount, nonetheless failed to tender the commissions to Wilkie, thereby violating the Wage Act. Tender must be “without stipulations or conditions.” Davis v. Allstate Ins. Co., 434 Mass. 174, 185 (2001); Black’s Law Dictionary 1507 (8th ed. 2004) (defining tender as “an unconditional offer of money or performance to satisfy a debt or obligation”); cf. Goes v. Feldman, 8 Mass.App.Ct. 84, 92 (1979) (“A person who receives a check with what is in substance a release of disputed claims written on it has not . . . received a tender of payment"). The Act provides that wages “shall” be paid, a mandatory direction with no qualifications. G.L.c. 149, § 148. Apromise ofpayment of what the employer acknowledges is owed, conditioned on execution of a release or on other consideration beyond the services by which the compensation was earned, is not a tender complying with the Act.[7]
NETS argues that because it had indicated to Wilkie that it wished to negotiate a change in his compensation structure, and the parties were thereafter unable to agree on new terms, there was no compensation arrangement in place for 2003. This argument is singularly unpersuasive. Wilkie was an employee at ■will. NETS was free to terminate his employment, or to impose changes in terms unilaterally (in response to which Wilkie, if dissatisfied, could leave NETS’ employ). It did neither of these things, however; rather, it continued to accept Wilkie’s services, and the commissions on the sales he made, until the two parted ways on February 11. The at-will employment contract continued in force until terminated by one party or the other, or modified by mutual agreement. NETS’ mere proposal of new compensation terms — while continuing to pay Wilkie his biweekly salary — did not transform Wilkie, from that moment forward, into a volunteer.
NETS further argues that the severance agreement was binding because Wilkie verbally accepted it, cashed two checks issued under it, and accepted health benefits for two months. This argument, too, is unavailing, for several reasons. First, the letter agreement on its face contemplates that it will be executed as a written agreement, even advising Wilkie “to consult with an attorney before signing this letter.” The con elusory allegation that Wilkie “verbally accepted” the agreement but never signed the document is insufficient to create a genuine issue of material fact as to the existence of a binding agreement.[8] Second, Wilkie’s acceptance of payment, in an amount less than what was owed him as commissions even without the severance agreement, is indicative neither of acceptance nor of rejection of the severance agreement. Third, the cost of post-termination health benefits was deducted from the amended (May 1) determination of commissions owed to Wilkie, meaning that NETS’ own conduct is inconsistent with there having been a binding severance agreement.
The failure of NETS to tender compensation under the employment contract constitutes a violation of the Wage Act and a breach of the employment contract.[9] Judgment will therefore enter for Wilkie as to liability on Counts I and II.

B. Damages

When an employer improperly withholds wages from an employee, that employer is subject to a cause of action under G.L.c. 149, §150. That section provides *189 for relief including injunctive relief, actual damages incurred, and treble damages for any loss of wages or other benefits. G.L.c. 149, §150. In addition, an employee who prevails is entitled to costs and reasonable attorneys fees. Id.
The undisputed facts of record appear to suggest that Wilkie is owed the $37,459.67 in commissions calculated in the May 1 letter, plus the $717.30 in vacation pay calculated in the April 23 letter, less (perhaps) the “nearly $10,000" paid as severance. The lack of particularity as to the amount of severance paid — and some unclariiy as to whether these payments ought to be netted out, or not[10] — means that a precise computation of damages cannot be accomplished on this record.
There is, moreover, the question of treble damages. The SJC has recently held that the Act’s treble damages provision is not automatic, but must follow a finding that the defendant’s conduct has been “outrageous, because of the defendant’s evil motive or his reckless indifference to the rights of others.” Wiedmann v. The Bradford Group, Inc., 444 Mass. 698, 709-10 (2005) (citations omitted). “In cases where motive, intent, or other state of mind questions are at issue, summary judgment is often inappropriate.” Flesner, 410 Mass. at 809, citing Pederson v. Time, Inc., 404 Mass. 14, 17 (1989) (“the generally accepted rule is that the ‘granting of summary judgment in a case where a party’s state of mind . . . constitutes an essential element of the cause of action is disfavored’ ”), quoting Quincy Mut. Fire Ins. Co. v. Abernathy, 393 Mass. 81, 86 (1984). The undisputed facts in this record do not establish conclusively that NETS’ conduct was outrageous; the claim for treble damages, therefore, like the computation of single damages, will have to await trial.
Attorneys fees are automatic on the Wage Act claim. The record does not, however, include any submission as to actual fees incurred, or what would be reasonable. An award of attorneys fees, as with a damage award, will therefore need to await further proceedings.

ORDER

For the foregoing reasons, the plaintiffs motion for summary judgment as to Counts I and II is ALLOWED IN PART, as to liability, and DENIED IN PART, as to damages.

 The commissions would be determined quarterly when the generated sales exceed $25,000, with the caveat that if total annual generated sales did not exceed $100,000, Wilkie would have to return a proportionate share of the quarterly commissions.

 Nhere are additional counts alleging breach of an agreement to award Wilkie an ownership interest in NETS, misrepresentation, promissory estoppel, breach of the implied covenant of good faith and fair dealing, and interference with contractual and/or advantageous relations. Neither side seeks a disposition of these counts at this time.

 Under this law, “[e]veiy person having employees in his service shall pay weekly or biweekly each such employee the wages earned by him to within six days of the termination of the pay period during which the wages were earned if employed for five or six days in a calendar week, or to within seven days of the termination of the pay period during which the wages were earned if such employee is employed seven days in a calendar week . . . but any employee leaving his employment shall be paid in full on the following regular pay day, and, in the absence of a regular pay day, on the following Saturday; and an employee discharged from such employment shall be paid in full on the day of his discharge . . .” G.L.c. 149, §148.

 The Act provides that: “Any employee claiming to be aggrieved by a violation . . . may institute and prosecute in his own name and on his own behalf... a civil action for injunctive relief and any damages incurred, including treble damages for any loss of wages and other benefits. An employee so aggrieved and who prevails in such an action shall be entitled to an award of the costs of the litigation and reasonable attorney fees.” G.L.c. 149, §150.

 Fraser v. Pegasystems, Inc., 19 Mass. L. Rptr. No. 18, 404, 404 (July 11, 2005) (Fishman, J.), is not to the contrary. There, an employee agreed toa new commission plan for2003 that changed, unfavorably to him, from the 2002 plan. He argued that he and the employer had an implied contract that he would be paid a commission on a particular sale based on the 2002 plan, asserting that the deal had “taken flight” in 2002, though it did not actually close until 2003. The Court rejected the argument, finding that in the absence of a contract provision or past practice, the employee had no reasonable expectation that a deal still inchoate in 2002 would fall under that year’s compensation plan.

 To illustrate the point: the April 23 letter offered payment of $27,821.61 in commissions, plus two days’ vacation pay, but required that Wilkie first execute a release of all Wage Act claims. Had he done so, he would have released the difference between this and the higher amount which NETS concluded, a week later in the May 1 letter, was actually owing. NETS had no right to demand this of him. Under the Act, wages and commissions which “halve] been definitely determined and halve] become due and payable” are to be paid, period.

 The Caveney affidavit nowhere states whether Wilkie accepted the agreement in a meeting, over the telephone, or in some other way, and does not purport to quote or paraphrase what Wilkie actually said. See Ng Bros. Constr., Inc. v. Cranney, 436 Mass. 638, 648 (2002) (“An adverse party may not manufacture disputes by conclusoiy factual assertions; such attempts to establish issues of fact are not sufficient to defeat summary judgment”).

 Although the defendants failed to file an objection as to motion for summary judgment on Count II, this Court will infer that its objection as to Count I is intended to apply to both Counts.

 For example, in its May 1, 2002 calculation of what Wilkie was owed, NETS does not appear to have deducted the “nearly $10,000" it says was paid as severance under an agreement that Wilkie never signed, and whose repudiation NETS appears to have acknowledged when it took credit for the March and April health insurance premiums it had paid on Wilkie’s behalf.