Billings, Thomas P., J.
In this and a related putative class action (Sanderson et cd. v. Verdasys, Inc. et al., SUCV 12-621-BLS1), minoriiy shareholders have challenged a recapitalization in early 2011 of Ver-dasys, Inc, a closely held Delaware corporation. The plaintiff in this case (hereinafter, “Stamos”) originally asserted the same claims and one more for negligent misrepresentation, on the same allegations, as were made on behalf of the class in Sanderson, and additional claims arising out of his employment relationship with Verdasys. For reasons detailed in the margin,[1] Stamos’s shareholder claims have since been modified slightly, but still largely mirror those left standing in Sanderson. My rulings in this case will similarly mirror those on the Sanderson motion to dismiss.
As in Sanderson, the defendants are in two separately represented groups: the “Corporate Defendants” (Verdasys, the members of its board of directors (the “Director Defendants”) and two founders and former directors (Michels and Birnbaum)), on the one hand, and the “Investor Defendants” (the company’s three largest investors including two fund groups) on the other. Both groups have moved to dismiss most of the Complaint under Rule 12(b)(6) for failure to state a claim, and under Rule 23.1 for bringing directly what the defendants contend should be derivative claims and for failing to make a pre-suit demand.
For the reasons that follow, the motions to dismiss are ALLOWED IN PART and DENIED IN PART, as more fully set forth in the Order below.
FACTS
The allegations concerning Verdasys’s 2011 recapitalization that underlie the shareholder claims (Counts 1-9) are sufficiently set forth in the Sanderson decision that they need not be repeated here, except as necessary in the Discussion section, below, in connection with Count 5.
In connection with Stamos’s employment-related claims, the First Amended Complaint alleges the following facts, the truth of which is assumed for present purposes. In response to an instance of apparent misappropriation of confidential information at Neu-rogenesis Pharmaceuticals, two of its employees—defendants Seth Birnbaum and Allen Michels—became interested in developing a computer security product that would enable its user (iypically, a company or firm with an intranet used by its employees) to track the actions of any other user on a network or on an individual computer, thereby enabling the company to detect and document improper uses. Birnbaum and Michels brought Stamos into Neurogenesis to work on the project, and he recruited others. Stamos led the development team, which by the spring of 2003 had produced working prototypes demonstrating the viability of the concept.
Around this time, Birnbaum and Michels decided they would leave Neurogenesis to form a start-up company to finish developing the original idea into a commercially viable product. Stamos agreed to join them without an employment contract, demanding instead that he be treated as a founding partner with significant equity in the company. The others agreed, and when Verdasys—which Birnbaum had registered with the Delaware Secretary of State in January 2003—issued stock, Michels and Stamos each received 1,000,000 of 5,000,000 authorized shares; Birnbaum received 1,050,000 shares, and five other employees and four investors divided the rest. Stamos invested just $1,000 cash in the company, “with the true consideration [for his shares] being his ‘sweat equity’ as a founder of the business and primary architect of the Company’s signature software product.” His title initially was Vice President of Research & Development, at a below-market annual salary of $150,000. Working over 70 hours a week, Stamos led the team that developed Verdasys’s primary product, called “Digital Guardian.”
Time passed; the company went through several rounds of financing; and the composition of the Board changed as private equity investors were given seats. Conflict developed between the investors, who held several classes of preferred stock, and employees who held common stock. Ultimately, the investors won out, and the Board which they controlled effected the 2011 recapitalization, more fully described in the Sanderson decision, which is the subject of the shareholder claims in that case and this.
Stamos’s employment-related grievances relate to the following.
A. Unpaid Commissions
1. TD Ameritrade
Stamos’s assignment was product development, not sales. Even when, in June 2006, he was promoted to the post of Corporate President (with a salary of $250,000 plus annual bonuses), his responsibilities remained focused on managing and developing Verdasys’s information technology, assisting the sales force by providing technical information to prospective clients as needed.
In the spring of 2007, Verdasys was courting TD Ameritrade as a customer for an as-yet undeveloped product. That April, Stamos, Michels and Birnbaum agreed that if Stamos could land the account, he would received a commission of 10% on gross receipts. The *356 deal was “cash on cash” with no other contingencies, meaning that when TD Ameritrade made a payment, ten percent of it would go to Stamos. Stamos wooed Ameritrade executives, to good effect: on February 15, 2008 Ameritrade and Verdasys executed a $15 million contract. In May 2008, TD Ameritrade made its first payment of $5 million, and Verdasys cut a check to Stamos for $500,000.
In the spring of 2009 Birnbaum, the company’s CEO, directed Stamos to make the closing of new business his main priority, and agreed that he would be compensated as a salesperson would on any business that he developed and closed.
TD Ameritrade made its second payment in the spring of 2010, in the amount of $4,350,000, on which Stamos was owed a commission of $435,000. Ver-dasys, however, refused to pay it.
2. Bain Capital
In late 2010, Bain Capital was a prospective Verdasys client. The Head of Sales for Verdasys, Dennis Allan, agreed on the company’s behalf that if Stamos could get the fish into the boat, he would receive a 10% commission on all receipts, cash on cash. Stamos made “significant sales efforts with Bain,” resulting in a $250,000 contract signed on December 20, 2010. Bain paid the $250,000 in the December 2010-January 2011 period, and Stamos demanded his commission from Verdasys. The latter responded that there was no commission agreement, and refused to pay.
3. Department of Justice
The United States Department of Justice was an existing Verdasys client, but in January 2011, the relationship was in trouble: the DOJ had paid $450,000, but Verdasys had notified it that the product would not be ready by its delivery date. The salesman on the account had just resigned, and the executive sales manager assigned to it had been terminated five months earlier. The DOJ’s senior Unit Chief e-mailed Stamos, with whom the DOJ had a good relationship, to complain and to offer Verdasys a chance to fix the situation before it was referred for legal action. Stamos forwarded the email to Verdasys’s new CEO (Jim Ricotta), Allan, and others.
Allan asked Stamos to deal with the issue and to try and persuade the DOJ to place additional product and service orders, including a $1,000,000 product maintenance order in the first quarter of 2011. Stamos and Allan agreed that Stamos would receive the standard 10% commission, cash-on-cash, on any maintenance contract paid in the first quarter and on any additional products and services Stamos could convince the DOJ it needed. In fact, Stamos persuaded the DOJ to place a $1.3 million maintenance order for the first quarter, and an additional $1.5 million order for new products, for a total of $2.8 million in new DOJ business. DOJ paid the full $2.8 million in April. Stamos demanded his commission but Verdasys, as it had with respect to the Bain Capital commission, denied that there was any commission agreement, and refused to pay.
On July 11, 2011 Stamos reported Verdasys’s failure to pay all three commissions to the Attorney General’s office which, on August 3, 2011, issued a right-to-sue letter.
B. Options
Sometime in 2004, Verdasys adopted the Verdasys Inc. 2004 Equity Incentive Plan. Under it, Stamos was granted the following options for Verdasys common stock:
Grant Full Vest Expiration Strike
Date Shares Date Date Price
8/26/04 200,000 8/26/08 8/26/14 or $.20/share termination + 30 days
11/15/06 300,000 termination + 30 days 7/1/10 11/15/16 or $.42/share
At paragraph 3, the Plan stated that “[a]wards granted pursuant to the plan shall not expire solely by reason of the termination of the Plan.” Nevertheless, on February 3, 2011 Stamos was notified that as part of Verdasys’s upcoming recapitalization all of his vested options would be canceled, and that he would be issued new options subsequent to the transaction. The transactional documents for the recapitalization, however, provided no such thing: rather, they specified that the Plan would be terminated, that no further grants would be made under it, but that “outstanding options under the 2004 Option Plan shall remain outstanding pursuant to the terms of the 2004 option plan and any applicable option agreements.”
The Verdasys recapitalization—which included a complicated “reverse stock split”—closed on April 8, 2011. A month and a half later, on May 20, 2011, Stamos resigned his position at Verdasys. On June 1, 2011, through his attorney, he sent Verdasys a letter exercising his options, promising to wire $166,000— the strike price for all of his options in both grants— immediately, in exchange for 500,000 shares. Verdasys did not respond. The demand was repeated in a second letter on June 9, which requested a response by day’s end. Verdasys’s response came on June 16, offering to issue Stamos 10,000 shares for $166,000, “falsely claiming that his options were reduced by the ‘reverse stock split’ effectuated as part of the Recapitalization.”
C. Vacation Pay
Beginning in 2004, Verdasys had a “use it or lose it” policy regarding vacation pay, but it did not enforce the policy at all at first; later, enforcement was sporadic. Stamos, who “played a critical role in the overall operation, day-to-day business, and future growth of *357 Verdasys,” was discouraged by the company and its senior executives from taking vacation. The result was that in the eight years and three months that he worked there, Stamos earned about twenty-five weeks of vacation time and used only six weeks. After he resigned, the company paid him for four weeks’ vacation time, leaving a balance of fifteen weeks, or $72,115 in salary due. Stamos’s July 11, 2011 letter to the Attorney General’s office and the August 3,2011 right-to-sue letter covered vacation time as well as commissions.
DISCUSSION
The Complaint asserts the following Counts.
No. Claim Against
1. Breach of Fiduciary Duly Director Defendants
2. Breach of Fiduciary Duty Investor Defendants
3. Equity Dilution Investor Defendants
4. Declaratory Judgment Verdasys, Director Defendants, and Investor Defendants
5. Negligent Misrepresentation Verdasys, Director Defendants, and Investor Defendants
6. Unjust Enrichment Investor Defendants
7. Conversion Director Defendants
8. Constructive Trust re: Pre-Recapitalization Shares Director Defendants and Investor Defendants
9. Aiding and Abetting Breach of Fiduciary Duty Michels and Birnbaum
10. Breach of Contract: Aug. 2004 Options Agreement Verdasys
11. Intentional Interference with Contract: Aug. 2004 Options Agreement Director Defendants
12. Breach of Implied Covenant of Good Faith and Fair Dealing: Aug. 2004 Options Agreement Verdasys
13. Promissory Estoppel: Aug. 2004 Options Agreement Verdasys
14. Unjust Enrichment: Aug. 2004 Options Agreement Director Defendants and Investor Defendants
15. Conversion: Aug. 2004 Options Agreement Verdasys and Director Defendants
16. Breach of Contract: Nov. 2006 Options Agreement Verdasys
17. Intentional Interference with Contract: Nov. 2006 Options Agreement Director Defendants
18. Breach of Implied Covenant Verdasys of Good Faith and Fair Dealing: Nov. 2006 Options Agreement
19. Promissory Estoppel: Aug. Nov. 2006 Options Agreement Verdasys
20. Unjust Enrichment: Nov. 2006 Options Agreement Director Defendants and Investor Defendants
21. Conversion: Nov. 2006 Options Agreement Verdasys and Director Defendants
22. Violation of Mass. Wage Act: TD Ameritrade Verdasys
23. Breach of Contract: TD Ameritrade Verdadys
24. Breach of Implied Covenant of Good Faith and Fair Dealing: TD Ameritrade Verdasys
25. Quantum Meruit/Unjust Enrichment: TD Ameritrade Verdasys
26. Violation of Mass. Wage Act: Bain Capital Verdasys
27. Breach of Contract: Bain Capital Verdasys
28. Breach of Implied Covenant of Good Faith and Fair Dealing: Bain Capital Verdasys
29. Quantum Meruit/Unjust Enrichment: Bain Capital Verdasys
30. Violation of Mass. Wage Act: DOJ Verdasys
31. Breach of Contract: DOJ Verdasys
32. Breach of Implied Covenant Verdasys of Good Faith and Fair Dealing: DOJ
33. Quantum Meruit/Unjust Verdasys Enrichment: DOJ
34. Violation of Mass. Wage Verdasys Act: Vacation Pay
As noted above, Counts 1-9 assert challenges by Stamos, as a Verdasys shareholder, to the recapitalization. With the exception of Count 5, each replicates a count pled in the Sanderson complaint, whose sufficiency has already been the subj'ect of a ruling in that case. I therefore will not revisit these claims here, except to conform the Order in this case to that in Sanderson [31 Mass. L. Rptr. 22].
Count 5 asserts a new claim for negligent misrepresentation in the recapitalization, which is ad *358 dressed below. The remainder (Counts 10-34) all assert claims by Stamos in his capacity as a former Verdasys employee and partaker of certain of its employee benefits. These have little (other than dramatis personae and historical background) in common with Sanderson’s shareholder claims, and so are here addressed in full.
A. Standard on a Motion to Dismiss
To withstand a Rule 12(b)(6) motion to dismiss, a plaintiffs complaint must contain “allegations plausibly suggesting (not merely consistent with) an entitlement to relief, in order to reflect [a] threshold requirement . . . that the plain statement possess enough heft to sho[w] that the pleader is entitled to relief.” Iannacchino v. Ford Motor Co., 451 Mass. 623, 636 (2008), quoting Bell Atl Corp. v. Twombly, 550 U.S. 544, 555-57 (2007) (internal quotations omitted). While a complaint need not set forth detailed factual allegations, a plaintiff is required to present more than labels and conclusions, and must raise a right to relief “above the speculative level . . . [based] on the assumption that all the allegations in the complaint are true (even if doubtful in fact)” Id.
B. Count 5: Negligent Misrepresentation
Count 5 alleges that Verdasys, the director defendants, and the investor defendants owed to Stamos, a minority shareholder, “a duty to disclose information, within their knowledge, that might have assisted Stamos in taking a position on the Recapitalization.” (¶192.) Had he been properly informed, Stamos says, “there is no doubt that he would have taken more aggressive action to protect his interests, up to and including using his considerable influence with common shareholders to garner sufficient votes to defeat the recapitalization or, if that failed, filing a legal action to stop the sham vote from even taking place.” (¶125.)
Although the complaint also alleges omissions in the disclosures concerning “the voting process, and the impact it would have on the common shareholders,” the centerpiece of Count 5 is the allegation that although the disclosure materials showed that the two founders, Michels and Birnbaum (who collectively owned 40% of the common stock), owed Ver-dasys $50,569 and $119,476, respectively, they omitted to mention the embarrassing origin of the debts (misappropriation of corporate assets to pay for personal expenses and to support extramarital affairs), and falsely stated that the company intended to “aggressively pursue! ]” them in 2011. In fact, the complaint alleges, defendants Keshian and Stettner[2] promised Michels and Birnbaum that if they voted for the recapitalization, the company would forgive their debts and spare them the expense and embarrassment of a lawsuit over their breaches of fiduciary duty. In keeping with this bargain, the company has since provided Michels and Birnbaum with releases agreeing not to pursue the company’s claims against them.
Stamos and the other shareholders were not told that the votes of 40% of the common shares in favor of the recapitalization had been purchased.
There was a substantial likelihood that the disclosure of those omitted facts would have been viewed by a reasonable investor as having significantly altered the total mix of information made available. In fact, had Stamos known the true details of the Recapitalization, including the coercion of the votes, and what was needed to achieve the Recapitalization, he would have mobilized the other common shareholders not to vote for the plan, sought representation at the Board level of the common shareholders’ interests and/or pursued legal action to stop the process.
Under Delaware law,[3] a claim of negligent misrepresentation (or, in Delaware parlance, “equitable fraud”) requires:
1) a particular duty to provide accurate information, based on the plaintiffs pecuniary interest in that information; 2) the supplying of false information; 3) failure to exercise reasonable care in obtaining or communicating information; and 4) a pecuniary loss caused by justifiable reliance on the false information.
H-M Wexford LLC v. Encorp, Inc., 832 A.2d 129, 147 n.44 (Del-Ch. 2003); see Zirn v. VLI, Corp., 681 A.2d 1050, 1060-61 (Del. 1996).
Count 5 is not mentioned in the Corporate Defendants’ papers. The Investor Defendants address it, however, by noting that under Delaware law, a minority shareholder generally does not owe a fiduciary duty to other shareholders, Ivanhoe Partners v. Newmount Mining Corp., 535 A.2d 1334, 1344 (Del. 1987); that indeed, given Stamos’s position as President, the duty of disclosure rather ran in the other direction; and that in any event, the Complaint fails to ascribe specific statements to particular Investor Defendants. See Steinman v. Levine, 2002 WL 31761252 (Del.Ch. Nov 27, 2002) (NO. CIV.A. 19107), affd, 822 A.2d 397 (Del. 2003) (plaintiff “is required to identify specific acts of individual defendants for his negligent misrepresentation claim to survive”).
As more fully discussed in the Sanderson decision (p. 21), the Complaint adequately alleges that the Investor Defendants “had a commonality of interest, that they controlled the Board, and that by agreement they worked together to effect the recapitalization for their own ends, at the expense of the common shareholders.” This brings the claim within the exception to the Ivanhoe Partners rule, under which a minority shareholder assumes a fiduciary duly toward other shareholders where it “exercises control over the business affairs of the corporation.” 535 A.2d at 1344. *359 “That duty is one of complete candor and flows from the controlling shareholder’s overriding obligation of fair dealing.” Kahn v. Household Acquisition Corp., 591 A.2d 166, 171 (Del. 1991).
It was the Board which was ultimately responsible for preparation of the disclosure materials for the recapitalization. The Complaint alleges, however, that two Board members in particular—Keshian and Stett-ner, both affiliated with the Special Situation Funds— made the deals with Michels and Birnbaum, which the Board then failed to disclose to shareholders. It does not allege that the other Investor Defendants knew of the deal, or should have known of it, or approved it. Count 5 will therefore be dismissed as to the Investor Defendants other than the various Special Situation Funds, whose interests Keshian and Stettner represented.
C. Claims Pertaining to Options[4]
Counts 10 through 21 pertain to Stamos’s attempt to exercise his options for 500,000 shares of common stock, and Verdasys’s response that the $166,000 he had tendered would only buy him 10,000 shares. For each of the 2004 and the 2006 grants, Stamos asserts six claims: for breach of contract, intentional interference with contract, breach of the implied covenant of good faith and fair dealing, promissory estoppel, unjust enrichment, and conversion.
1.Count 10 and 16: Breach of Contract (Verdasys)
To their opposition to the Motion to Dismiss, the Corporate Defendants have appropriately attached copies of certain documents that are referenced in the Complaint. See Marram v. Kobrick Offshore Fund, Ltd., 442 Mass. 43, 45 n.4 (2004) (“[w]here, as here, the plaintiff had notice of these documents and relied on them in framing the complaint, the attachment of such documents to a motion to dismiss does not convert the motion to one for summary judgment”); Harhen v. Brown, 431 Mass. 838, 840 (2000) (a “court may consider documents referenced in plaintiffs complaint without converting motion to dismiss into motion for summary judgment”).
The 2004 Equity Incentive Plan (Exhibit C to the Corporate Defendants’ brief), in section 7.1, anticipated that various corporate actions—including a reverse stock split—could result in Verdasys’s common shares being “exchanged for a different number or kind of shares,” and provided that if this occurred, “an appropriate and proportionate adjustment will be made in . . . the numbers and kinds of shares or other securities subject to the then outstanding Awards.”
Consistently with the Plan terms, the Board resolved unanimously by an Action in Lieu of Meeting dated January 11, 2011 (Corporate Defendants’ Exhibit D) that option awards under the Plan would be reduced by the same 1:50 ratio as common shares had suffered in the reverse stock split.
As both sides agreed at oral argument, the offer in the June 16, 2011 response to Stamos’s tender to issue him 10,000 shares for $166,000, rather than the 500,000 shares he had demanded, got the math right; the only issue, therefore, is whether the reverse stock split was unlawful (as the Complaint elsewhere asserts) or not. The motion to dismiss Counts 10 and 16 is therefore allowed in part, as to so much of each Count as seeks relief absent a judgment invalidating the reverse stock split.
2. Counts 11 and 17: Intentional Interference with Contract (Director Defendants)
“In an action for wrongful interference with contract the plaintiff must prove that the plaintiff had a contract with a third party, the defendant knowingly induced the third party to break that contract, the defendant’s interference was improper in motive or means, and the plaintiff was harmed by the interference.” Abramian v. President & Fellows of Harvard College, 432 Mass. 107, 122 (2000). “Where the defendant is a corporate official acting in the scope of his corporate responsibilities, a plaintiff has a heightened burden of showing the improper motive or means constituted ‘actual malice,’ that is, ‘a spiteful, malignant purpose, unrelated to the legitimate corporate interest.’ ” Psy-Ed Corp. v. Klein, 459 Mass. 697, 716 (2011), quoting Blackstone v. Cashman, 448 Mass. 255, 260-61 (2007). The Complaint in this case alleges no such thing. Counts 11 and 17 will therefore be dismissed.
3. Counts 12 and 18: Breach of Implied Covenant of Good Faith and Fair Dealing (Verdasys)
Counts 12 and 18 allege that “in preventing Stamos from reaping the benefits of’ his option grants, Ver-dasys breached the implied covenant of good faith and fair dealing.
Every contract is subject to an implied covenant of good faith and fair dealing. The purpose of the covenant “is to guarantee that the parties remain faithful to the intended and agreed expectations” of the contract, and to ensure that “neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.” The covenant “may not. . . be invoked to create rights and duties not otherwise provided for in the existing contractual relationship.” “The scope of the covenant is only as broad as the contract that governs the particular relationship.”
Liss v. Studeny, 450 Mass. 473, 477 (2008).
Notwithstanding the above, there are cases in which the implied covenant is appropriately deployed to redress conduct by a contracting party that, although compliant with the contract’s literal terms, is taken in bad faith for ulterior purposes. See, e.g., Anthony’s Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 471-74 (1991) (seller’s abuse of *360 discretionary plan approval right, in order to extort a higher price); Fortune v. National Cash Register Co., 373 Mass. 96, 101-03 (1977) (employer’s termination of commission salesman in order to avoid paying cash-on-cash commissions earned but not yet payable).
This is not such a case; Stamos does not, for example, and could not plausibly claim that the motive behind the recapitalization was Verdasys’s desire to cheat him out of the stock he was entitled to. Rather, this is a case in which Stamos’s entitlements are expressly established in the contract documents, though they depend to a material degree on an issue external to them (the legality of the otherwise-motivated recapitalization). Counts 12 and 18, in other words, add nothing to Counts 10 and 16, and will be dismissed as surplusage.
4.Counts 13 and 19: Promissory Estoppel (Verdasys)
Counts 13 and 19 allege that “Verdasys promised Stamos that it would compensate him for the work he put into the Company”; specifically, that he would be able to exercise the options granted him in 2004 and 2006. “An element of promissory estoppel is that the party invoking it must have reasonably relied on the alleged promise to his detriment.” Hall v. Horizon House Microwave, Inc., 24 Mass.App.Ct. 84, 93 (1987). Reliance on a promise that contradicts the express terms of a fully integrated contract on the same subject matter is unreasonable as a matter of law. Masingill v. EMC Corp., 449 Mass. 532, 541 (2007). Here again, then, the claims are barred to the extent they seek to enlarge upon Stamos’s contract rights, and are otherwise superfluous. Counts 13 and 19 will therefore be dismissed.
5.Counts 14 and 20; Unjust Enrichment (Director Defendants and Investor Defendants)
“By not honoring Stamos’s demand for stock under the [August 2004 and November 2006 Options Agreements],” Counts 14 and 20 assert, “the Director Defendants and the Investor Defendants were enriched by avoiding dilution of their fully-diluted percentage ownership in Verdasys.”
Quantum meruit “is a claim independent of an assertion for damages under the contract, although both claims have as a common basis the contract itself.” It is an obligation that arises under quasi contract theory in which an obligation is “created by law ‘for reasons of justice, without any expression of assent and sometimes even against a clear expression of dissent.’ ” ‘The fact that a person has benefited from another ‘is not of itself sufficient to require the other to make restitution therefor.’ ” “The underlying basis for awarding quantum me-ruit damages in a quasi-contract case is unjust enrichment of one party and unjust detriment to the other party.” The injustice of the enrichment or detriment equates with the defeat of a person’s reasonable expectations.
Liss v. Studeny, 450 Mass, at 479-80 (citations omitted).
As in Counts 12, 13, 18 and 19, Stamos could not recover anything against Verdasys in quantum meruit going beyond his entitlements under the contract terms.
Recovery in quantum meruit presupposes that no valid contract covers the subject matter of a dispute. Where such a contract exists, the law need not create a quantum meruit right to receive compensation for services rendered.
Boswell v. Zephyr Lines, Inc., 414 Mass. 241, 250 (1993); see Kennedy v. B.A. Gardetto, Inc., 306 Mass. 212, 216 (1940) (“the law will not imply a contract where there is an existing valid express contract embracing the same subject matter, nor a promise of any person against his own express declaration,” provided the rights sought to be implied are of “the same class or kind of acts or stipulations as that to which the express agreement or covenant relates”).
Counts 14 and 20, however, are asserted only against the Director Defendants and the Investor Defendants, who were not parties to the option agreements between Stamos and Verdasys. The express terms of those agreements, however, bear directly on whether Stamos’s expectations were reasonable and whether the defendants’ supposed enrichment[5] was consequently unjust—both preconditions to a quantum meruit recovery. See Finard & Co. v. SITT Asset Management, 79 Mass.App.Ct. 226, 229 (2011) (“[t]o achieve recovery upon the theory of quantum meruit, the claimant must prove (1) that it conferred a measurable benefit upon the defendants; (2) that the claimant reasonably expected compensation from the defendants; and (3) that the defendants accepted the benefit with the knowledge, actual or chargeable, of the claimant’s reasonable expectation”). Given the expressly contrary provisions of the option agréments, the answer to both questions is “No.” Counts 14 and 20 will therefore be dismissed.
6.Counts 15 and 21: Conversion (Verdasys and Director Defendants)
Counts 15 and 21 characterize Verdasys’s refusal to issue the full 500,000 shares demanded in his tender as an “exercise! ] [of] dominion and control over Stamos’s property” by Verdasys and its directors. ‘The elements of conversion require that a defendant be proved to have ‘intentionally or wrongfully exercise[d] acts of ownership, control or dominion over personal property to which he has no right of possession at the time . . .’ ” In re Brauer, 452 Mass. 56, 67 (2008) (citations omitted).
The defendants did not take from Stamos—that is, exercise dominion or control over—anything that he *361 then owned; indeed, they did not take anything at all. Rather, they refused to recognize contract rights which—depending on the legality of the recapitalization—he may or may not have had. In these circumstances, “the case must be decided, not as a tort action for injury to or conversion of property, but as a claim for a . . . breach of contract.” Laurin v. DeCarolis Constr. Co., 372 Mass. 688, 691 (1977). Counts 15 and 21 will therefore be dismissed.
D. Counts 22, 26, 30: Wage Act Claims Relating to Commissions (Verdasys)
Counts 22 through 33 assert, for each of the claimed commissions (on the TD Ameritrade, Bain Capital, and Department of Justice accounts), claims against Verdasys under the Massachusetts Wage Act and for breach of contract, breach of the implied covenant of good faith and fair dealing, and quantum meruit (unjust enrichment). Of these, Verdasys challenges only the Wage Act claims.
The Wage Act (G.L.c. 149, §148) requires the prompt payment of certain forms of employee compensation, and provides:
This section shall apply, so far as apt, to the payment of commissions when the amount of such commissions, less allowable or authorized deductions, has been definitely determined and has become due and payable to such employee . . .
“The term ‘commission’ is commonly understood to refer to compensation owed to those in the business of selling goods, services, or real estate, set typically as a percentage of the sales price.” Suominen v. Goodman Indus. Equities Mgmt. Group, LLC, 78 Mass.App.Ct. 723, 738 (2011) (holding that employee’s promised share of real estate developer’s “promoted interests”—"a share of the overall profits generated by the development efforts"—did not constitute “commissions”; quoting Webster’s New Universal Unabridged Dictionary 364 (2d ed. 1983) (defining “commission” as “[a] percentage of the money taken in on sales, given as pay to a salesclerk or agent, usually in addition to salary or wages”).
The promised payments in this case were unquestionably “commissions” in the generally accepted sense of the word. Aline of lower-court cases, however, has imposed additional requirements beyond those expressly set out in the statute. In Commonwealth v. Savage, 31 Mass.App.Ct. 714 (1991), the Appeals Court held that the Act did not extend to commissions due a real estate broker. Said the court:
From the caption to [the] act[6] and from the placement of the provision in the weekly payment statute, one infers a Legislative purpose to assist employees who would ordinarily be paid on a weekly basis, such as retail salespeople, and for whom commissions constitute a significant part of weekly income.
Real estate brokers are not in that category. The transactions are not regular, but episodic; the commissions are often substantial. The distinct and relatively independent status of real estate brokers has been recognized in other statutes . . .
Id. at 716.
From Savage there developed the doctrine, followed faithfully in numerous decisions from this Court (including at least one of mine) and from the federal courts, that to fall within the Act, commissions must “constitute a significant part of weekly income” and must fall due “regular[ly],” not “episodic[ally].”[7] Id. Fourteen years later, however, came the SJC’s decision in Wiedmann v. Bradford Group, Inc., 444 Mass. 698, 703-04 (2005), which had this to say:
Although the Savage court inferred from the title of the weekly wage law that it applied to commissions that were paid on a weekly basis, nothing in the weekly wage law itself requires the weekly payment of wages. Rather, it sets out different payment deadlines for different types of employees. G.L.c. 149, §148. The paragraph of §148 that is relevant to commissions states that it applies “so far as apt” to commissions that are definitely determined and have become due and payable. (Footnote and citation omitted.)
In Okerman v. VA Software Corp., 69 Mass.App.Ct. 771, 778-79 (2007), the Appeals Court revisited the regular/episodic issue in light of the Wiedmann decision, and concluded that at the very least, its suggestion in Savage that the Act covered only commissions earned and due weekly had missed the mark. Observing that “[w]here ‘the language of the statute is clear, it is the function of the judiciary to apply it, not amend it,’ ” id. at 777, the court now concluded both “that the wage act applies more broadly than Savage suggested,” and also that “[t]o the extent that Savage’s discussion of the language relevant to commissions in the wage act has been read to permit other restrictions to be added to §48, that reading is incorrect.” Id. at 779; see also Suominen at 738 n.20, and Weems v. Citigroup, inc., 453 Mass. 147, 152 (2009).
The Act’s plain language no more requires that commissions be “regular” than that all wages be paid weekly. I believe it is now clear that this language is to be taken at face value, and that so long as a commission was truly a commission (that is, a salesperson’s promised percentage of the price of goods or services sold), and provided it was “definitely determined” (that is, “arithmetically determinable,” Wiedmann at 709), it is covered by the Act, and that this is so irrespective of whether it was regular or irregular, weekly or infrequent, whether it did or didn’t constitute a substantial portion of the employee’s income, and whether or not the employee was otherwise highly compensated.[8] As Stamos has pleaded the *362 necessary elements, the motion is denied as to Counts 22, 26, and 30.
E. Count 34: Wage Act Claim Relating to Vacation Pay (Verdasys)
The dispute over the viability of Count 34 centers on the enforceability, in the circumstances, of Verdasys’s “use-it-or-lose-it” policy for accrued vacation time. To augment the allegations of the Complaint, Verdasys has supplied copies of a document titled “Verdasys Paid Time Off Policy” and an e-mail from Nicole Kelley, Administration Manager, to a redacted address(es) and bearing the date December 18, 2008. The former says, “Vacation which is unused at the end of a calendar year may be carried over into the next calendar year but must be used within twelve months or forfeited.” The latter summarizes the policy; acknowledges that its enforcement “has been uneven at best” such that some employees had accrued large balances of vacation time; and advised that employees with more than 30 days over the annual carry-over limit of 15 days would be required to reduce the accrued amount by 30 vacation days as of December 31, 2009, then eliminate any additional days over the 15-day limit by June 30, 2010.
These documents are certainly related to the Complaint’s allegations that “Verdasys claims to have enforced a ‘use it or lose it’ policy concerning accrued vacation time” (¶159) and that the policy “had been in place since 2004 but had initially never been enforced and was subsequently enforced only sporadically” (¶160). Neither, however, is expressly referenced in the Complaint; nor do the papers establish beyond doubt that Stamos and his counsel had notice of them and relied on them in framing the complaint (though they may well have).
The enforceability of such a policy, moreover, depends on the employer providing employees with “adequate prior notice” and “a reasonable opportunity to use the accumulated vacation time within the time limits established by the employer.” Massachusetts Attorney General’s Fair Labor Division on Vacation Policies, Advisory 99/1. The devil is clearly in the details, and the Complaint adequately alleges (at ¶159) that Stamos, due to his enhanced responsibilities from 2008 forward, did not have a reasonable opportunity to use his accumulated vacation time within the newly established time limits of the ‘use it or lose it’ policy." The motion is therefore denied as to Count 34.
ORDER
For the foregoing reasons, the Motions to Dismiss are ALLOWED IN PART, as follows:
Counts 11, 12, 13, 14, 15, 17, 18, 19, 20, 21, and so much of Counts 10 and 16 as seek relief absent a judgment invalidating the reverse stock split, are dismissed.
The Motion is otherwise DENIED.

This and the Sanderson case were filed together. I heard argument on the motions to dismiss, and started work on the decision in Sanderson. Shortly before that was finished, however, I learned from plaintiffs’ counsel in both cases that an amended complaint was contemplated. I finished and released the Sanderson decision, which was a denial save for dismissal, in part, of a single count. Stamos’s amended complaint arrived in due course with the dismissed partial claim omitted and the negligent misrepresentation claim (Count 5) added. A new oral argument was had thereafter, and I now render this decision.

Keshian and Stettner were Board members representing the Special Situation Funds, which held 11.5% of Verdasys’s stock prior to the recapitalization.

Although negligent misrepresentation is a common-law cause of action recognized in Massachusetts law, see Nota Constr. Corp. v. Keyes Assocs., Inc., 45 Mass.App.Ct. 15, 19-20 (1998), the claim in this case implicates the duties imposed on a corporation, its officers, and its shareholders in the conduct of the corporation’s internal affairs; thus, the law of the state of incorporation applies. Harrison v. NetC-entric Corp., 433 Mass. 465, 471 (2001).

The parties appear to assume, and I do as well, that unlike the claims relating to corporate governance (Counts 1-9), those deriving from Stamos’s employment with Verdasys (Counts 10-34) are governed by the law of Massachusetts, the locus of Verdasys’s operations and Stamos’s employment.

As the Director Defendants (Keshian, Stettner, and Warren) point out, the Complaint nowhere alleges that they owned any Verdasys stock, without which they could not themselves have been enriched by the dilution of Stamos’s shares.

“An Act relative to the weekly payment of commissions due to certain employees.”

See, e.g., Wilkie v. Nets, Inc., 2005 WL 3105692 (Mass.Super. 2005; Billings, J.) [20 Mass. L. Rptr. 176); Okerman v. VA Software Corp., 2003 WL 21960599 (Mass.Super. 2003; (Cratsley, J.) [16 Mass. L. Rptr. 513], S.C., 69 Mass.App.Ct. 771 (2007); Richards v. Datatec Systems, Inc., 2005 WL 1156162 (Mass.Super. 2005; Bumes, J.) [19 Mass. L. Rptr. 343]; Beadle v. M.S. Inserts and Fasteners Corp., 2004 WL 1109796 (Mass.Super. 2004; Kern, J.) [17 Mass. L. Rptr. 623]; Dobin v. Cioview Corp., 2003 WL 22454602 (Mass.Super. 2003; Gants, J.) [16 Mass. L. Rptr. 785]; Dennis v. Jager, Smith & Stetler, P.C., 11 Mass. L. Rptr. No. 24, 567, 568 (July 17, 2000) (Ball, J.). The defendants also cite numerous federal court decisions adopting the same stance.
These and other judicially created exceptions were sometimes defended on the ground that because the Act carries criminal penalties, narrow construction was indicated. See, e.g., Prozinski v. Northeast real Estate Services, LLC, 59 Mass.App.Ct. 599, 602-03 (2003); Navisite, Inc. v. Cloonan, 2005 WL 1528903 (Mass.Super. 2005 (Billings, J.). In DiFiore v. American Airlines, 454 Mass. 486, 497 n.12 (2009), however, the SJC noted that “[a]ssuming, without deciding, that the rule of lenity applies in a civil action when the violation of the statute may trigger criminal penalties,” it should be used only to resolve ambiguities, not “in favor of fanciful or perverse” interpretations of unambiguous statutory language.

This was another judicially engrafted exception which never gained much traction, and has since been discarded. See discussions in Okerman, 69 Mass.App.Ct. at 776-77, and in Dobin v. Cioview Corp., 2003 WL 22454602 (Mass.Super. 2003; Gants, J.), supra [16 Mass. L. Rptr. 785].